IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOHNATHAN HATCH, et al., | ) | |
| *on behalf of themselves and others similarly situated*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:16CV925 |
| | ) | |
| MICHAEL A. DEMAYO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Before the Court is Plaintiffs' motion to certify a class pursuant to Federal Rule of Civil Procedure 23. (ECF No. 104.) For the reasons that follow, the motion will be denied.

**I.  BACKGROUND**

In this action, Plaintiffs allege that Defendants violated the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq.*, by obtaining their names and addresses from automobile accident reports and using that information for marketing purposes.[1] (ECF No. 100.) In North Carolina, law enforcement officers are required to investigate automobile accidents that are reported to them. N.C. Gen. Stat. § 20-166.1(e). Within twenty-four hours, an investigating officer must "make a written report of the accident" to be furnished to the

---

[1] The DPPA makes it "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record," for any use other than the fourteen "[p]ermissible uses" enumerated in the statute. *See* 18 U.S.C. §§ 2721(b); 2722(a). Further, a person "who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for [an improper purpose] shall be liable to the individual to whom the information pertains." *Id.* § 2724(a).

state's Division of Motor Vehicles (the "Division"). *See id.* The Division makes a standard crash report form—the DMV-349—available to law enforcement agencies for this purpose. (*See* ECF No. 24-1 at 9–15.) Among other information, the form has fields for identifying each driver involved in the accident, including spaces for name, address, date of birth, and license number. (*See id.* at 14.) It is also important to note here that, next to the address field, the form asks "Same Address on Driver's License?" and provides checkboxes for officers to indicate "Yes" or "No." (*See id.*)

According to their complaint,[2] each of the three named Plaintiffs were involved in car accidents between 2015 and 2017. (ECF No. 100 ¶¶ 28, 40, 52.) In each instance, police officers from the Charlotte-Mecklenburg Police Department ("CMPD") or troopers from the North Carolina State Highway Patrol ("NCSHP") investigated the accident and recorded their findings on a DMV-349. (*Id.* ¶¶ 29–32, 41–44, 53–56.) To complete the form's driver-identification fields, the investigating officers first asked each Plaintiff for his driver's license, then copied the relevant information directly from the license onto the form. (*See id.* ¶¶ 30, 42, 54.) The officers also asked each Plaintiff whether the information on his license was still current, and when each Plaintiff answered in the affirmative, the officers checked the affiliated "Yes" box mentioned above. (*Id.* ¶¶ 31, 43, 55.) The DMV-349 forms were then filed with the Division. (*Id.* ¶¶ 33, 45, 57.)

Not long after their accidents, Plaintiffs began receiving unsolicited marketing materials from various North Carolina attorneys and law firms—the Defendants—who had obtained

---

[2] The complaint referenced throughout this opinion is the operative Second Amended Complaint, (ECF No. 100).

their names and addresses from their respective DMV-349s.[3] (*See id.* ¶¶ 34–39, 46–51, 58–63.) The central question forming the basis of this lawsuit is whether, as Plaintiffs allege, Defendants' conduct in gathering accident reports and using the information contained therein to market legal services violates the DPPA.

Plaintiffs filed the instant motion for class certification on October 30, 2019.[4] (ECF No. 104.) The proposed class definition is as follows:

> Every natural person identified on a DMV-349, which was prepared by either the Charlotte-Mecklenburg Police Department or the North Carolina State Highway Patrol, as a driver licensed in North Carolina whose address is designated on the DMV-349 as matching the address on that person's driver's license,
>
> > (a) with respect to whom a Defendant received directly or indirectly from the DMV-349 or its electronic equivalent the person's name or address in connection with a Defendant's direct-mail marketing program and/or
> >
> > (b) to whom a Defendant named in this action sent a mailing with the words "This is an advertisement for legal services" printed on the outside of the envelope, within the 4 years preceding the filing of this action through conclusion of this action.

(ECF Nos. 100 ¶ 73; 105 at 5.) Having considered the parties' briefs and the corresponding evidentiary record,[5] the Court finds that the certification question is ripe for disposition.

---

[3] It appears that, whether directly or indirectly, each Defendant obtained drivers' names and addresses from DMV-349s by way of third-party data aggregation services. (*See* ECF No. 105 at 10–16.)

[4] "At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A).

[5] "When deciding a motion for class certification, . . . an evidentiary hearing is typically held on the certification issue." *See Monroe v. City of Charlottesville*, 579 F.3d 380, 384 (4th Cir. 2009). However, nothing in the Federal Rules requires such a hearing where, as here, Plaintiffs—who bear the burden of proving that certification is proper—have not requested one. *See* L.R. 23.1(b); 5 Moore's Federal Practice – Civil § 23.82[2]. The Court therefore proceeds based on the parties' deposition excerpts and other evidence formally submitted into the record.

## II. LEGAL STANDARD

Plaintiffs seeking class certification "must affirmatively demonstrate [their] compliance" with Federal Rule of Civil Procedure 23. *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rule 23(a) requires that a prospective class satisfy four prerequisites to ensure that the class claims are fairly encompassed by those of the named plaintiffs. *See* Fed. R. Civ. P. 23(a). These prerequisites are often referred to as numerosity, commonality, typicality, and adequacy. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019). The Fourth Circuit has also recognized that Rule 23 "contains an implicit threshold requirement" of "ascertainability"—that the members of a proposed class be "readily identifiable" by way of reference to objective criteria. *See id.* at 654–55. If these initial requirements are met, the plaintiffs must then demonstrate that the proposed class fits within at least one of the three types of classes outlined in Rule 23(b). *Id.* at 655.

Although it is Plaintiffs' burden to demonstrate compliance with Rule 23, this Court "has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Dukes*, 564 U.S. at 350–51). As Rule 23's criteria are often "enmeshed in the factual and legal issues comprising the plaintiff's cause of action," this analysis may entail some consideration of the merits of the underlying claims. *See Dukes*, 564 U.S. at 351. However, "[m]erits questions may be considered . . . only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## III. ANALYSIS

The parties primarily dispute whether Plaintiffs' claims present questions in common with, and are typical of, the class; whether Plaintiffs and their counsel can adequately represent the interests of the proposed class; and whether the class can be properly certified under either Rule 23(b)(2) or Rule 23(b)(3). The Court will begin with the threshold 23(a) prerequisites.

Two of the prerequisites, numerosity and ascertainability, require little discussion. The numerosity of the proposed class is beyond dispute, as Defendants have testified that they cumulatively acquired names and addresses from hundreds, if not thousands of DMV-349s per week over the class period. (*See* ECF No. 105 at 11–16 (consolidating deposition testimony).) Furthermore, despite their number, the proposed class members are readily ascertainable. The parameters of the class and subclass are based on (a) spreadsheets and client information in Defendants' possession and (b) Defendants' mailing records and sorting criteria. With those datasets in hand, it would most certainly be "administratively feasible . . . for the court to determine whether a particular individual is a [class] member." *See Krakauer*, 925 F.3d at 658; *Kingery v. Quicken Loans, Inc.*, 300 F.R.D. 258, 264 (S.D.W. Va. 2014) (finding class ascertainable even though "some effort to sift through [defendant's] data warehouse" would be required). The remaining prerequisites of commonality, typicality, and adequacy of representation require greater discussion.

### A. Commonality

Certification is only appropriate if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Because "any competently crafted class complaint literally raises common questions"—Were the drivers involved in car accidents? Was a DMV-349

5

form created by an investigating officer in each instance? Did the Defendants obtain those accident reports?—what matters most to commonality is "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *See Dukes*, 564 U.S. at 349–50. Further, although Rule 23(a)(2) speaks of "questions," plural, "[a] single common question will suffice," so long as it is "of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *EQT*, 764 F.3d at 360 (citing *Dukes*, 564 U.S. at 350, 359).

The instant suit raises (at least) three questions which, on their faces, are both central to any member's claim—and thus have the potential to unite class members under a "common contention," *see Dukes*, 564 U.S. at 350—but not so inherently sweeping as to necessarily encompass differences that may impede common adjudication: (1) whether the name and address information in class members' DMV-349s was derived from "motor vehicle records" (as that term is understood in the DPPA context); (2) whether Defendants knowingly obtained that information; and, (3) if so, whether they did so for an impermissible purpose. Based on the materials submitted, the latter two questions appear well-suited to common resolution—an answer of "yes, they did" or "no, they did not" will apply equally to all class members and "resolve an issue central to the validity" of each member's DPPA claim. Thus, the Court finds that their existence is sufficient to meet Rule 23(a)'s threshold commonality requirement.

The first question, however—whether each class member's information was obtained from a "motor vehicle record"—warrants further discussion; if not for commonality (which has been met), then for the related requirements of typicality (under 23(a)(3)) and predominance (under 23(b)(3)), as discussed below. *See* 1 Newberg on Class Actions §§ 3:25–

3:27 (5th Ed. 2020) (hereinafter "Newberg") (noting overlap among these requirements). The DPPA *only* imposes liability for personal information that has been obtained "from a motor vehicle record." *See* 18 U.S.C. § 2722(a). "The origin of the information is thus crucial to the illegality of [Defendants' conduct]—the statute is agnostic to the [use] of the very same information acquired from a lawful source." *Dahlstrom v. Sun–Times Media, LLC*, 777 F.3d 937, 949 (7th Cir. 2015). Put another way: the validity of any DPPA claim hinges not just on the kind of information at issue, but the source of that information as well.

Plaintiffs have failed to persuade the Court that this central merits question—Where did the information come from?—can ultimately be answered with class-wide proof. The DPPA defines a "motor vehicle record" as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). In light of that definition, no party has argued that accident reports are themselves "motor vehicle records." Rather, Plaintiffs proceed under the theory that, when an accident occurs, the investigating officer gathers name and address information from either a driver's license or a database operated by the Division, and that that information retains a motor-vehicle-record character even as it becomes part of another document.[6] (*See, e.g.*, ECF No. 147 at 11–17.)

The evidentiary problem with this theory is twofold. First, the record shows that name and address information included in DMV-349s sometimes comes from sources other than

---

[6] The parties disagree as to whether a driver's license—in possession of its owner, but relinquished at the request of an investigating officer—is, in fact, a "motor vehicle record." (*Compare* ECF No. 130 at 8–9, *with* ECF No. 147 at 11–16.) However, because the instant motion for class certification does not depend on resolution of that question, the Court declines to answer it at this time.

driver's licenses or Division databases. For example, "on occasion, a trooper might respond to an accident and discover that a driver does not have his license." (ECF No. 105-32 ¶ 11.) In those cases, the driver might "orally give the trooper the information to input into the accident report, such as the driver's name, address, and license number." (*Id.*; *see also* ECF No. 130-2 at 25.) Alternatively, a driver might provide an alternative form of ID, like a "debit card [or] passport." (ECF No. 130-2 at 25.) These non-motor-vehicle-record sources can, of course, serve as a starting point for an officer to auto-populate a DMV-349 with information by using a Division-run database. However, the record shows that there are instances in which the auto-population function is unavailable; perhaps due to a poor internet connection, or because the database itself is down. (*See* ECF Nos. 105-32 ¶ 12; 130-2 at 7.) In short, the names and addresses found in DMV-349s do not necessarily originate from a driver's license or Division-run database.

That the identifying information in DMV-349s comes from multiple sources—some "motor vehicle records," some not—wouldn't present a serious issue if the source of the information in each form could be easily known. Were that the case, Plaintiffs could further refine the proposed class to include only those individuals whose information was derived from DPPA-protected sources. However, herein lies the second facet of the problem: once a DMV-349 is completed and submitted, there is no way to tell the source of the information on the form. (*See, e.g.*, ECF Nos. 105-32 ¶ 16; 130-2 at 11–12.) Because a DMV-349 which includes DPPA-protected information appears indistinguishable from one that doesn't, the question of whether the information obtained by Defendants came "from a motor vehicle record" does not lend itself to a common answer.

8

Plaintiffs argue that, by limiting their proposed class to only those individuals whose DMV-349s have the "Yes" box checked next to the "Same Address on Driver's License?" prompt, the "from a motor vehicle record" element "can be proved on a class-wide basis with common proof." (*See* ECF No. 147 at 7.) In essence, their argument is that North Carolina has a "uniform procedure" for completing DMV-349s, (*id.* at 8), pursuant to which investigating officers are trained to mark the "Yes" box "only if the officer has compared the current address to the license or to a [Division] database," (*id.* at 10). Thus, they contend, a class limited to only those individuals with their "Yes" boxes checked is a class whose DMV-349 information "is *the same as* the information on [their] license[s] or in [their] record[s] in the [Division] database." (*Id.* at 17.)

In response to this "verification" argument, Defendants first suggest that the policy of checking the "Yes" box to signal confirmation may not, in fact, be uniformly followed across all North Carolina law enforcement agencies. (*See, e.g.*, ECF No. 130 at 10–11.) However, even assuming that all investigating officers follow the same procedure—only checking "Yes" if they have actually verified a driver's information against either her license or a Division database—Plaintiffs' theory faces another hurdle. Information flowing from a non-DPPA-protected source does not automatically garner statutory protection whenever it is confirmed to be "the same as" information in a "motor vehicle record." As explained above, "[a] plain reading of the DPPA makes clear that the Act was intended to prohibit only the disclosure or redisclosure of information *originating* from [motor vehicle records]." *See Siegler v. Best Buy Co. of Minn., Inc.*, 519 F. App'x 604, 605 (11th Cir. 2013). The record, here, however, makes clear that answering "Yes" to the "Same Address on Driver's License?" question in no way alters

9

the source of the information on a DMV-349; rather, it merely signals to the Division "whether its internal records have the driver's most current address." (*See* ECF No. 105-32 ¶ 11); *see also New Richmond News v. City of New Richmond*, 881 N.W.2d 339, 356 (Wis. Ct. App. 2016) (concluding that "information that is obtained from another source and subsequently verified using DMV records is not subject to the DPPA, as long as, upon verification, the information is not substantively altered to conform to the DMV records").

Thus, Plaintiffs have not yet shown that the common and also crucial question of whether each class member's information was obtained "from a motor vehicle record" can be answered "in one stroke." Rule 23(a) commonality is still satisfied here, as the class members are united by the two other common questions of law and fact discussed above. However, as explained further below, the inability to readily determine the source of any given class member's DMV-349 information weighs heavily against certification.

**B. Typicality**

The next prerequisite is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned"—some minor variation between a named plaintiff's individual claim and those of the class members she aims to represent is to be expected. *See Dieter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). However, courts will readily deny class certification "when the variation in claims strikes at the heart of the respective causes of actions." *See id.* That is the case here. According to the complaint, the officer investigating each of the named Plaintiffs' accidents asked for (and was given) the Plaintiff's driver's license, then used that

10

license to complete a DMV-349. (*See* ECF No. 100 ¶¶ 30, 42, 54.) However, as explained above, this experience is not necessarily typical. Not all DMV-349s are completed using a driver's license, and, sometimes, officers may not gather information "from a motor vehicle record" at all.

In another DPPA case involving accident reports and the marketing of legal services, the Northern District of Illinois declined to certify a proposed class based, in part, on its finding that typicality was lacking. *See Pavone v. Meyerkord & Meyerkord, LLC*, 321 F.R.D. 314, 323 (N.D. Ill. 2017). There, as here, the evidence revealed that police officers throughout the state prepared accident reports "using various sources of information and not necessarily from a driver's license," as had been the case for the named plaintiff. *Id.* In light of that variability, the court concluded that the named plaintiff's DPPA claims "d[id] not have the same essential characteristics as the class claims" and were therefore not typical.[7] *See id.* This Court reaches the same conclusion and finds that Plaintiffs have not demonstrated typicality.

Because the prerequisite of typicality is absent here, certification is inappropriate. This would generally end the Court's inquiry; however, because of the Court's obligation to conduct a "rigorous analysis" of Rule 23's criteria, and to avoid arguments raised but not addressed

---

[7] In *Wilcox v. Swapp*, the Eastern District of Washington certified a class whose members had likewise had their personal information obtained from accident reports by a law firm. *See* 330 F.R.D. 584, 589, 599 (E.D. Wa. 2019). The distinguishing feature of that case, however, was that the class was limited to "drivers identified in Police Traffic Collision Reports whose Personal Information, *as defined by the DPPA, was derived from a Department of Licensing record* (e.g. license, registration or database)" and obtained by the defendant firm. *Id.* at 589–90 (emphasis added). Because every class member's information, by definition, was derived "from a motor vehicle record," the court determined that the class "[did] not suffer from the same typicality deficiencies that the proposed classes in *Pavone* . . . presented." *Id.* at 592.

11

serving as the basis of future litigation, the Court, in the interest of judicial economy, will discuss the remaining arguments for and against certification.

## C. Adequacy of Representation

Representative parties and class counsel must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4), (g)(4); *see also Sharp Farms v. Speaks*, 917 F.3d 276, 290 & n.7 (4th Cir. 2019). Defendants challenge the adequacy of both Plaintiffs and their counsel on two main grounds: (1) that Plaintiffs' understanding, and control of this case is insufficient; and (2) that strategic litigation choices made by Plaintiffs and their counsel have revealed fundamental conflicts among certain members of the proposed class. (*See* ECF Nos. 130 at 12–19; 134 at 36–39.) The Court will address each argument in turn.

### i. *Plaintiffs' knowledge and involvement.*

The adequacy inquiry entails an investigation into the representatives' knowledge—both of the case and of their duties to the proposed class—as well as their credibility and integrity. *See generally Monroe*, 579 F.3d at 385; Newberg §§ 3:67–3:68. Certification may be inappropriate where the named plaintiffs demonstrate so little understanding of their case, or take so light a hand in its direction, as to raise doubts about their ability to protect the interests of the class. *See* 1 McLaughlin on Class Actions § 4:29 (16th ed. 2019). "Generally," however, "the representative's understanding of the basic facts underlying the claims, [along with] some general knowledge of and a willingness and ability to participate in discovery are sufficient to meet this standard." *See id.*; *see also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) ("It is hornbook law . . that in a complex lawsuit . . . the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.")

Defendants highlight portions of Plaintiffs' depositions which, they contend, show that Plaintiffs lack sufficient understanding and control of this case. (*See, e.g.*, ECF No. 130 at 15–17.) For example, two Plaintiffs testified that they had not read the complaint in full before it was filed, (*see, e.g.*, ECF Nos. 130-8 at 19; 130-9 at 27), while a third indicated that he had not attentively followed the case's progress, (*see,* ECF No. 130-3 at 6). One Plaintiff even seemed unsure as to whether or not he was trying to be a class representative. (*See id.* at 7–8.) However, if the Court looks only slightly beyond these handpicked excerpts, it becomes clear that Plaintiffs have the requisite knowledge and interest to clear the low bar for adequacy. With the exception of Plaintiff Epperson, who more recently joined this suit, each has been involved in this case for more than four years. (*See* ECF No. 5.) All have prepared for and attended hours-long depositions, during which they evinced knowledge of and about the DPPA and Defendants' alleged misconduct. (*See* ECF No. 147 at 22–24.) On the basis of that participation, the Court finds that Plaintiffs have a reasonable understanding of and investment in this suit, which is all that is required. *Compare Clark v. Duke Univ.*, No. 1:16-CV-1044, 2018 WL 1801946, at *7 (M.D.N.C. Apr. 13, 2018) (concluding, based on declarations and participation in depositions, that named plaintiffs would adequately represent a class), *with Monroe*, 579 F.3d at 385 (affirming district court's decision not to certify class when named plaintiff "had little interest in or knowledge and understanding of the case" and "offered virtually no evidence refuting glaring questions as to his adequacy as a class representative").

    ii.    *Potential beneficiaries and damages waiver.*

Defendants also assert that Plaintiffs cannot adequately represent the proposed class because some class unnamed members may have actually appreciated receiving Defendants'

marketing letters. (*See, e.g.*, ECF No. 130 at 12.) Generally speaking, a class should not be certified when a fundamental conflict of interest exists between named plaintiffs and the class they seek to represent. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Sharp Farms*, 917 F.3d at 290, 295. However, the Court does not agree that there is a fundamental conflict between those who found Defendants' conduct annoying, harmful, or invasive, and those who found it helpful. "[I]t will almost always be the case that some member in a large class prefers the status quo for some reasons." Newberg § 3:64. And here, it is hard to see what those class members who ostensibly benefitted from Defendants' conduct would have to lose if the class were certified—they, too, could receive $2,500 in liquidated damages if Plaintiffs prevailed, and, having been made aware of Defendants through past mailings, would remain free to seek their legal services in the future. *See Sharp Farms*, 917 F.3d at 295 (explaining that "[a] conflict is not fundamental when" all members of the proposed class "have the same interest in establishing the liability of defendants").

In a related, but somewhat inverse argument, Defendants also fault Plaintiffs and their counsel for disclaiming monetary damages in excess of the $2,500 floor provided for in the DPPA.[8] (*See, e.g.*, ECF No. 130 at 17–18.) The contention here appears to be that, in addition to neglecting the interests of class members who may have been harmed *less*, Plaintiffs have also disregarded the interests of class members who may have been harmed *more*, so as to more easily facilitate class certification. Class representatives have a "fiduciary duty not to throw

---

[8] For a DPPA violation, the Court "may award," among other relief, "actual damages, but not less than liquidated damages in the amount of $2,500." *See* 18 U.S.C. 2724(b). According to the complaint, Plaintiffs have limited the monetary damages they seek to "liquidated damages . . . in the amount of $2,500.00 for each instance in which a Defendant knowingly obtained or used [a Plaintiff or class member's] protected personal information" in violation of the DPPA. (*See* ECF No. 100 at 25–26.)

14

away what could be a major component of the class's recovery," *see Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 594 (2013), and while the Court is skeptical that the conduct at issue here would give rise to actual damages in excess of $2,500, some of the Plaintiffs have at least acknowledged that possibility, (*see* ECF Nos. 130-3 at 23; 130-8 at 31). Nevertheless, the proposed damages limitation does not appear to be so significant that it should preclude a finding of adequacy. *Cf. Krakauer*, 925 F.3d at 649–51 (upholding class certification in case alleging violations of the Telephone Consumer Protection Act, which, like the DPPA, entitles a successful plaintiff "to receive the greater of either his actual loss or statutory damages"); *Stillmock v. Weiss Mkts., Inc.*, 385 F. App'x 267, 273 (4th Cir. 2010) (quoting *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) ("Unless a district court finds that personal injuries are large in relation to statutory damages, a representative plaintiff must be allowed to forego claims for compensatory damages in order to achieve class certification.")).

Having concluded that Plaintiffs and their counsel would adequately represent the class, the Court has reached the end of its 23(a) analysis. To summarize: although the requirements of numerosity, ascertainability, commonality, and adequacy have been met, typicality is lacking. The Court now turns its attention to whether the proposed class can be certified under Rules 23(b)(2) or (b)(3).

### D. Certification Pursuant to Rule 23(b)(2)

A class may be certified under 23(b)(2) if each of the 23(a) requirements have been met and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Because the threshold requirement of typicality under 23(a) has *not* been met, (b)(2) certification is unavailable. In addition, discovery has cast serious doubt on whether Plaintiffs have standing to pursue injunctive relief at all. (*See* ECF Nos. 114 at 21; 130 at 19); *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240 (4th Cir. 2019) ("In a class action case, we look to the standing of the named plaintiff[s]."). "[C]ertification under Rule 23(b)(2) is appropriate only if members of the proposed class would benefit from the injunctive relief they request," *Thorn v. Jefferson–Pilot Life Ins. Co.*, 445 F.3d 311, 331 (4th Cir. 2006), and it is well established that an anticipated injury should be "certainly impending" to serve as the basis for standing to seek an injunction, *see Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019). Since the beginning of this litigation, however, all of the named Plaintiffs have stated that they are uncertain whether they are, in fact, at risk of any imminent future harm from the Defendants.[9] (*See* ECF Nos. 105-4 at 9; 130-3 at 25; 130-9 at 33.)

Because the threshold requirement of typicality has not been satisfied, and Plaintiffs' standing to pursue injunctive relief is questionable, the Court finds that (b)(2) certification would be improper at this time.

---

[9] The Court notes that the question of whether Plaintiffs have standing to pursue injunctive or declaratory relief is also raised in a pending motion to dismiss. (*See* ECF Nos. 114 at 18–22; 140 at 21–24.)

### E. Certification Pursuant to Rule 23(b)(3)

In the alternative, Plaintiffs seek certification under Rule 23(b)(3). (*See* ECF No. 105 at 25–29.) Again, assuming the requirements of 23(a) have been met, a plaintiff may obtain (b)(3) certification if "the court finds that questions of law or fact common to class members *predominate* over any questions affecting only individual members," and "a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). While Plaintiffs' request for (b)(3) certification is likewise stymied by their failure to satisfy 23(a), the Court will briefly discuss the other aspects of (b)(3)—predominance and superiority.

The Rule 23(b)(3) predominance inquiry overlaps with the commonality requirement in 23(a)(2). *See Amchem*, 521 U.S. at 623–24. However, the former is "more demanding," as its focus is "not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation." *See EQT*, 764 F.3d at 366. As explained above, there are several questions here that are susceptible to common resolution—most notably whether Defendants obtained the class members' names and addresses, and whether they did so for an improper purpose. However, Plaintiffs have not shown that an equally important, predicate question—whether that information was derived "from a motor vehicle record"—can be answered without individualized, fact-intensive investigations into each class member's accident. *See Amchem*, 521 U.S. at 623 (noting that the predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy"). With no swift mechanism for determining the source of the identifying information contained in each DMV-349, it is easy to imagine trial of this action becoming

17

unwieldy, and individualized assessments of liability "overwhelm[ing] the common ones." *Cf. Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988) (noting that, if individualized proof of a crucial element of a cause of action had been required, it "effectively would have prevented respondents from proceeding with a class action"). Thus, the Court declines to find that "the common, aggregation-enabling, issues in [this] case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016); *see also Pavone*, 321 F.R.D. at 322.

This inability to readily determine whether information came "from a motor vehicle record" impacts the other (b)(3) inquiry—superiority—as well. In certain ways, representative litigation would be an appropriate vehicle for adjudicating this controversy. Each individual member's claim is small, and despite the availability of attorneys' fees, there appears to have been little appetite for pursuing this particular kind of action alone. *See* Fed. R. Civ. P. 23(b)(3)(A). Nevertheless, the same evidentiary concerns undermining typicality and predominance rear their head when the Court considers "the likely difficulties in managing a class action." *See* Fed. R. Civ. P. 23(b)(3)(D). Aside from the "verification" argument dispensed with above, Plaintiffs have failed to suggest any method for handling the innumerable mini-trials that would be needed to uncover the source of each member's DMV-349 information, the sheer volume of which would make a class action unmanageable.[10]

---

[10] Defendants also argue that (b)(3) certification is inappropriate where a class carries the potential for "annihilating liability" grossly disproportionate to "harms that are virtually nonexistent." (*See* ECF Nos. 130 at 41; 134 at 29–32.) Whether a district court should consider the likelihood of ruinous liability at the certification stage is the subject of some disagreement. *Compare, e.g.*, *Stillmock*, 385 F. App'x at 278 (Wilkinson, J., concurring) (urging district courts to consider annihilating liability in the context of (b)(3) superiority analysis "when a plaintiff class whose members suffered no identity theft of any sort still threatens to wipe an entire company off the map"), *with Murray*, 434 F.3d at 953–54 ("While a statute remains on the books, . . . it must be enforced rather than subverted. An award that

## IV. CONCLUSION

In conclusion, the Court declines to certify the proposed class. While the prerequisites of numerosity, commonality, adequacy, and ascertainability are satisfied, a fundamental proof problem—the inability to determine the source of the information contained in any particular DMV-349—defeats typicality. Additional concerns related to standing and injunctive relief further weigh against certification under Rule 23(b)(2). Finally, because the individualized evidentiary problems pertaining to informational sources are likely to predominate (and, in turn, make class action an inferior method of adjudication), Rule 23(b)(3) certification is improper.

For the reasons stated herein, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Class Certification, (ECF No. 104), is DENIED.

This, the 13th day of August 2020.

/s/Loretta C. Biggs
United States District Judge

---

would be unconstitutionally excessive may be reduced, . . . but constitutional limits are best applied after a class has been certified."). However, because this Court has decided not to certify the proposed class for a variety of other reasons, it chooses not to wade into that debate here.