IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOHNATHAN HATCH, et al.,          )
                                  )
              Plaintiffs,         )
                                  )
         v.                       )          1:16cv925
                                  )
MICHAEL A. DEMAYO, et al.,        )
                                  )
              Defendants.         )

### MEMORANDUM OPINION AND ORDER

This case comes before the Court on (1) "Plaintiffs' Motion to Compel Discovery Responses from the DeMayo, Greve, and Gelshenen Defendants, and for Sanctions" (Docket Entry 154) (the "Plaintiffs' Motion"),[1] (2) the "Motion to File Material and Related Portions of Brief Under Seal" (Docket Entry 157) (the "Sealing Motion") filed by Johnathan Hatch, Mark Dvorsky, and Kelly Epperson (collectively, the "Plaintiffs"), and (3) the "Womble Defendants' Motion to Compel in Aid of Determining Adequacy of Class Representative and Class Counsel" (Docket Entry 158) (the "Defendants' Motion") filed by "the Defendants represented by Womble Bond Dickinson"[2] (id. at 1).

---

1 For purposes of the pending motions, (1) "Michael A. DeMayo and The Law Offices of Michael DeMayo, P.C." constitute the "DeMayo Defendants," (2) "Ted A. Greve and Ted A. Greve & Associates, P.A." constitute the "Greve Defendants," and (3) "John J. Gelshenen and Davis & Gelshenen, LLP" constitute the "Gelshenen Defendants." (Id. at 1 (internal quotation marks omitted).) [Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination. Additionally, for legibility reasons, this Opinion omits all-cap font in all quotations from the parties' materials.]

2 Per the signature block on Defendants' Motion, "Michael A.
(continued...)

For the reasons that follow, the Court will (1) grant in part and deny in part Plaintiffs' Motion, (2) grant in part and deny in part the Sealing Motion, and (3) deny Defendants' Motion.

**BACKGROUND**

On July 8, 2016, Johnathan Hatch (at times, "Hatch") and Shaterika Nicholson (at times, "Nicholson") initiated a putative class action against various lawyers and law firms, including most Womble Defendants, for allegedly violating the Driver's Privacy Protection Act of 1994, 18 U.S.C. § 2721 et seq. (the "DPPA"). (See Docket Entry 1 (the "Complaint") at 1-6.)[3] The Complaint noted that "[a] similar action was recently filed in the Middle District of North Carolina against different law firms for the same conduct as 1:16-cv-00542[]" (the "Garey Action"). (Id. at 2.)[4] On

---

2(...continued)
DeMayo, the Law Offices of Michael A. DeMayo, P.C., Law Offices of Michael A. DeMayo, L.L.P., Jason E. Taylor, Law Offices of Jason E. Taylor, P.C., Benjamin T. Cochran, Hardison & Cochran, PLLC, Carl B. Nagle, Nagle & Associates, P.A., John J. Gelshenen, Davis & Gelshenen LLP, Ted A. Greve, Ted A. Greve & Associates, P.A., Christopher T. May, and Estwanik & May, P.L.L.C." (collectively, the "Womble Defendants") comprise this group of defendants. (Id. at 6 (emphasis omitted).)

3  The Complaint named as defendants all Womble Defendants save Greve Defendants, Estwanik & May, P.L.L.C., and Christopher T. May. (Id.)

4  More specifically, on May 27, 2016, individuals initiated a purported class action lawsuit against a lawyer and various law firms for alleged violations of the DPPA. See Garey v. James S. Farrin, P.C., No. 1:16cv542, Docket Entry 1 (M.D.N.C. May 27, 2016). Similar to the instant action, that lawsuit challenged the obtainment and use of allegedly DPPA-protected information from
(continued...)

July 29, 2016, Hatch and Nicholson filed an amended complaint, which added Mark Dvorsky ("Dvorsky") as a plaintiff and Greve Defendants, Christopher T. May, and Estwanik & May, P.L.L.C. as defendants. (Docket Entry 5 (the "Amended Complaint") at 1-6.) Both the Complaint and the Amended Complaint challenged the defendants' obtainment and use of allegedly DPPA-protected personal information from accident reports to send legal advertisements to individuals involved in vehicular accidents within North Carolina. (See generally Docket Entries 1, 5.) The Complaint and the Amended Complaint defined the proposed class as:

> All natural persons residing in North Carolina identified on a DMV-349 as either a driver whose address is designated on the DMV-349 as matching the address on that person's driver's license or a registered owner of a vehicle registered with the North Carolina Division of Motor Vehicles to whom a Defendant named in this action sent a mailing with the words "This is an advertisement for legal services" printed on the outside of the envelope within the 4 years preceding the filing of this action through conclusion of this action.

(Docket Entry 1, ¶ 56; accord Docket Entry 5, ¶ 71.)

The defendants moved to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules"). (See Docket Entries 21, 23.) One week after the Court (per United States District Judge Loretta C. Biggs) denied the dismissal motions, the defendants moved to certify an interlocutory appeal of that denial. (See Docket Entries 35, 36.)

_____

4(...continued)
accident reports "to send marketing letters." Id. at 2.

While the appellate certification motion remained pending, certain defendants also moved for reconsideration of the denial. (See Docket Entry 45 (the "Farbman Motion").) The Court (per Judge Biggs) denied the appellate certification motion (see Docket Entry 57), and, less than a month later, Womble Defendants moved for reconsideration of the denial of their motion to dismiss (see Docket Entry 59). Shortly thereafter, on November 15, 2018, the Court (per Judge Biggs) ruled on the Farbman Motion, declining to dismiss the Amended Complaint. (See Docket Entry 63.) The Court (per the undersigned) then conducted an initial pretrial conference (see Docket Entry dated Nov. 26, 2018) and issued a Scheduling Order, which denied the defendants' request to delay issuance of said Scheduling Order pending resolution of Womble Defendants' reconsideration motion (see Text Order dated Nov. 27, 2018). That Text Order also "decline[d] to bifurcate (or trifurcate, as Defendants effectively request) the discovery process," instead establishing a deadline of February 28, 2020, to "complete all discovery." (Id.) The Court (per the undersigned) subsequently granted the request to extend deadlines filed by Hatch, Dvorsky, and Nicholson (collectively, the "Original Plaintiffs"), setting April 30, 2020, as the new deadline to "complete all discovery." (Text Order dated July 24, 2019.)[5]

_____

5 On April 30, 2020, the parties sought an extension of the discovery deadline to May 14, 2020, solely for the purpose of
(continued...)

4

On January 7, 2019, Original Plaintiffs served on Womble Defendants initial discovery requests, which sought information regarding, <u>inter alia</u>, their "Letter-Writing Program." (<u>See</u> Docket Entry 154-1 (the "Written Discovery") at 1-18.)  The Written Discovery defined "Letter-Writing Program" to mean "the activities involved in obtaining the names and addresses of people involved in accidents from NC D[MV]-349 forms, reviewing the forms, deciding who to mail material to, sending letters and material, and responding to responses." (<u>Id.</u> at 4 (internal quotation marks omitted).)  On August 19, 2019, Original Plaintiffs served Rule 30(b)(6) deposition notices on The Law Offices of Michael A. DeMayo, L.L.P. (the "DeMayo Firm"), Ted A. Greve & Associates, P.A. (the "Greve Firm"), and Davis & Gelshenen LLP (the "Gelshenen Firm"). (<u>See</u> Docket Entry 154-2 (the "Deposition Discovery") at 1-18.)  The Deposition Discovery requested production of certain documents prior to the noticed Rule 30(b)(6) depositions, including, as relevant here, Requests "3. Any and all documents (including copies of the letters themselves) identifying persons to whom the [relevant] firm sent or attempted to send letters in connection with its direct mail marketing program at any time on or after January 1, 2012," and "9. All records that contain the names

---

5(...continued)
deposing Plaintiffs' expert (<u>see</u> Docket Entry 160 at 1-3), which request the Court (per the undersigned) also granted (<u>see</u> Text Order dated May 1, 2020).

5

and/or addresses of persons who were sent direct mail advertisement since January 1, 2012." (Id. at 4, 5, 10, 11, 16, 17.)

On September 30, 2019, Original Plaintiffs sought leave to amend their complaint "(1) to streamline the class definition; (2) to substitute a new class representative (with Defendants' consent); and (3) to add a claim for punitive damages as to those Defendants who have continued their marketing campaigns even after this Court's Order denying Defendants' motions to dismiss." (See Docket Entry 97 at 2.) In particular, Original Plaintiffs proposed a new class definition, which "requires that the class member is a person (a) identified on a DMV-349 which was prepared by either the Charlotte-Mecklenburg Police Department or the North Carolina State Highway Patrol; and (b) whose personal information was received and/or used by Defendants for marketing purposes." (Id.) Original Plaintiffs explained that the restriction of class members to those identified on the specified agencies' accident reports "alleviates manageability concerns" and that "[t]he inclusion of persons whose personal information was 'received' by a Defendant in connection with a mail-marketing campaign is intended to address challenges created by those Defendants who claim to have destroyed (and in several cases, to continue to destroy) records relating to their mailings." (Id. at 3.) Original Plaintiffs further sought "to substitute Kelly Epperson [('Epperson')] for Shaterika Nicholson as a named plaintiff and

6

class representative[ because] Nicholson does not come within the new class definition[, but] Epperson does." (Id. at 4.)

On October 21, 2019, the defendants consented to the proposed amendment. (See Docket Entries 98, 99.) Accordingly, the Court (per the undersigned) granted the requested leave (see Text Order dated Oct. 22, 2019), and Plaintiffs filed their amended complaint on October 23, 2019 (see Docket Entry 100) (the "Second Amended Complaint"). The Second Amended Complaint provided the following class definition:

> Every natural person identified on a DMV-349, which was prepared by either the Charlotte-Mecklenburg Police Department or the North Carolina State Highway Patrol, as a driver licensed in North Carolina whose address is designated on the DMV-349 as matching the address on that person's driver's license, (a) with respect to whom a Defendant received directly or indirectly from the DMV-349 or its electronic equivalent the person's name or address in connection with a Defendant's direct-mail marketing program and/or (b) to whom a Defendant named in this action sent a mailing with the words "This is an advertisement for legal services" printed on the outside of the envelope, within the 4 years preceding the filing of this action through conclusion of this action.

(Id., ¶ 73.)

Two days later, the parties jointly moved for entry of "a Consent Protective Order Governing the Production and Use of Confidential Material." (Docket Entry 101 at 1 (emphasis omitted).) The Court (per the undersigned) granted that motion, entering the requested "Consent Protective Order" (Docket Entry 103 at 1 (emphasis omitted)). (See id. at 14.) Shortly thereafter, Plaintiffs moved for class certification (see Docket Entry 104), in

connection with which they moved to seal, <u>inter alia</u>, certain information that the defendants "claim is confidential" (Docket Entry 107 at 2). The defendants similarly moved to seal certain information filed in support of their oppositions to class certification. (<u>See, e.g.</u>, Docket Entries 131, 135.) As relevant here, the Court (per Judge Biggs) granted the parties' requests to seal information described as "'confidential and proprietary case-selection criteria and strategies'" (Docket Entry 152 (the "Sealing Order") at 4), as well as information regarding "'the process and procedures that [the Defendant law firms] use in operating their direct mail programs, including case selection information'" (<u>id.</u> at 6 (brackets in original)).

Approximately two weeks later, Plaintiffs filed Plaintiffs' Motion and the Sealing Motion. (<u>See</u> Docket Entries 154, 157.) The Sealing Motion indicates that, although "Plaintiffs do not claim the [identified] material is confidential and do not believe any of it is," they filed the Sealing Motion because the information at issue involves discovery materials that "Defendants have marked as confidential under the Consent Protective Order." (Docket Entry 157 at 2.) Relying on the Sealing Order (<u>see</u> Docket Entry 162 at 1, 3), Womble Defendants filed a brief in support of the Sealing Motion. (<u>See</u> Docket Entry 162.) In addition, the relevant defendants filed an opposition to Plaintiffs' Motion (<u>see</u> Docket Entry 161), and, on the final day of the discovery period, Womble

8

Defendants filed Defendants' Motion (see Docket Entry 158), which Plaintiffs oppose (see Docket Entry 164). After the parties finished briefing the pending motions, the Court (per Judge Biggs) denied Plaintiffs' class certification request on typicality grounds. (See Docket Entry 200 (the "Certification Opinion") at 19.)

## DISCUSSION

### I. Relevant Standards

### A. Discovery Standards

"The purpose of discovery is to provide a mechanism for making relevant information available to the litigants." Fed. R. Civ. P. 26 advisory committee's notes, 1983 Amendment. Thus, parties generally "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). "The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." Fed. R. Civ. P. 26 advisory committee's notes, 2015 Amendment; see also id. (explaining that Rule 26 imposes an "obligation o[n] the parties to consider the[ proportionality] factors in making discovery requests, responses, or objections"). In turn, relevancy "essentially involves a determination of how substantively the information requested bears on the issues to be tried." Mills v. East Gulf Coal Preparation

9

Co., LLC, 259 F.R.D. 118, 131 (S.D.W. Va. 2009) (internal quotation marks omitted); see also Cook v. Howard, 484 F. App'x 805, 812 (4th Cir. 2012) ("Relevance is thus the foundation for any request for production, regardless of the individual to whom a request is made."). "On relevancy matters, the trial court has broad discretion." Watson v. Lowcountry Red Cross, 974 F.2d 482, 489 (4th Cir. 1992).

Moreover, "the simple fact that requested information is discoverable . . . does not mean that discovery must be had. On its own initiative or in response to a motion for protective order under Rule 26(c), a district court may limit [discovery] . . . ." Nicholas v. Wyndham Int'l, Inc., 373 F.3d 537, 543 (4th Cir. 2004). Indeed, "[d]istrict courts enjoy nearly unfettered discretion to control the timing and scope of discovery." Hinkle v. City of Clarksburg, 81 F.3d 416, 426 (4th Cir. 1996); accord Cook, 484 F. App'x at 812 (observing that "[d]istrict courts are afforded broad discretion with respect to discovery").

Importantly, "[t]he civil discovery process is to be engaged in cooperatively." Mills, 259 F.R.D. at 130; see also Wagner v. St. Paul Fire & Marine Ins. Co., 238 F.R.D. 418, 422 (N.D.W. Va. 2006) (observing that "[g]amesmanship" in discovery "is not allowed"); M.D.N.C. LR 26.1(b)(1) ("The Court expects counsel to conduct discovery in good faith and to cooperate and be courteous with each other in all phases of the discovery process.").

Nevertheless, "hardball discovery is still a problem in some cases." Kinetic Concepts, Inc. v. ConvaTec Inc., 268 F.R.D. 226, 243 (M.D.N.C. 2010) (internal quotation marks, brackets, and ellipsis omitted) ("Kinetic Concepts I").  The Rules therefore permit litigants to bring unresolved discovery disputes before a court through a motion to compel discovery.  See id.  The party opposing discovery generally bears the burden on a motion to compel.  See id. at 243-44.  The Rules further authorize sanctions in connection with motions to compel discovery and generally mandate the awarding of attorney's fees incurred in pursuing a motion to compel "if the disclosure or requested discovery is provided after the motion was filed," Fed. R. Civ. P. 37(a)(5)(A).[6]

The Rules also provide sanctions for spoliation of evidence, including the failure to preserve electronically stored information ("ESI").  See Fed. R. Civ. P. 37(e).  In addition, the Court possesses inherent power to impose sanctions for spoliation of evidence, at least for non-ESI materials.  See Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) ("The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the

_____

        6    The Rules additionally authorize sanctions against "a party, [which] after being properly served with . . . a request for inspection under Rule 34, fails to serve its answers, objections, or written response."  Fed. R. Civ. P. 37(d)(1)(A)(ii).

judicial process.'").[7]  "Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  Id.

In this regard, it remains "well settled that a party has a duty to preserve evidence when the party is placed on notice that the evidence is relevant to the litigation or when the party should have known that the evidence may be relevant to future litigation." Eckhardt v. Bank of Am., N.A., No. 3:06cv512, 2008 WL 1995310, at *5 (W.D.N.C. May 6, 2008); see also Silvestri, 271 F.3d at 591 ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.").  "The duty to preserve

---

7    As the United States Court of Appeals for the Fourth Circuit has explained:

    The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth.  "[B]ecause no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions — all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition."  The courts must protect the integrity of the judicial process because, "[a]s soon as the process falters . . . the people are then justified in abandoning support for the system."

Id. (citation omitted) (brackets and ellipsis in original).

12

encompasses electronic communications and documents, such as emails, and documents created by computer, such as invoices." Eckhardt, 2008 WL 1995310, at *5 (citing Zubulake v. UBS Warburg, LLC, 220 F.R.D. 212, 217-18 (S.D.N.Y. 2003)). Thus, "once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." Zubulake, 220 F.R.D. at 218.

**B. Sealing Standards**

"[T]he courts of this country recognize a general right to inspect and copy . . . judicial records and documents." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978). "The right of public access to documents or materials filed in a district court derives from two independent sources: the common law and the First Amendment." Virginia Dep't of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004). As relevant here, the common-law presumption of access "can be rebutted if countervailing interests heavily outweigh the public interests in access," and "the party seeking to overcome the presumption bears the burden of showing some significant interest that outweighs the presumption." Id. (internal quotation marks and brackets omitted). "[W]hether to grant or restrict access to judicial records" under the common law "is a matter of a district court's 'supervisory power,' and it is [a decision] 'best left to the sound discretion of the [district]

13

court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.'" Id. (final set of brackets in original).

"When presented with a request to seal judicial records," the Court begins by "determin[ing] the source of the right of access with respect to each document," as "only then can it accurately weigh the competing interests at stake." Id. at 576 (internal quotation marks and brackets omitted). The Court thereafter must evaluate the competing interests under the following approach. First, "it must give the public notice of the request to seal and a reasonable opportunity to challenge the request." Id. Further, "it must consider less drastic alternatives to sealing." Id. Finally, "if it decides to seal[,] it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing." Id.

"Adherence to this procedure serves to ensure that the decision to seal materials will not be made lightly and that it will be subject to meaningful appellate review." Id. This approach also reflects the reality that "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern," Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829, 839 (1978), as well as that "the public's business is best done in public," Cochran v. Volvo Grp. N. Am., LLC, 931 F. Supp. 2d 725, 727 (M.D.N.C. 2013).

14

However, "the mere filing of a document with a court does not render the document judicial." In re Policy Mgmt. Sys. Corp., 67 F.3d 296 (table), Nos. 94-2254 & 94-2341, 1995 WL 541623, *4 (4th Cir. 1995); see also United States v. Moussaoui, 65 F. App'x 881, 889 (4th Cir. 2003) ("The unclassified appendix contains a wide variety of materials, such as pleadings, hearing and deposition transcripts, and some discovery materials. Some of these documents fall within the common law presumption of access, while others are subject to the greater right of access provided by the First Amendment. Still others may not qualify as 'judicial records' at all." (citing United States v. Amodeo, 44 F.3d 141, 145-46 (2d Cir. 1995))); Amodeo, 44 F.3d at 145 ("We think that the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access. We think that the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document."). Rather, "documents filed with the court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights." In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D), 707 F.3d 283, 290 (4th Cir. 2013). Accordingly, "[b]ecause discovery motions" often "involve procedural, rather than 'substantive' rights of the litigants," Kinetic Concepts, Inc. v. Convatec Inc., No. 1:08cv918, 2010 WL 1418312, at *9 (M.D.N.C. Apr. 2, 2010)

15

("Kinetic Concepts II"), courts have found that no right of public access attaches to materials filed with discovery motions. See id. at *9-10; see also, e.g., Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1312 (11th Cir. 2001) ("The better rule is that material filed with discovery motions is not subject to the common-law right of access, whereas discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right, and we so hold.").

In such circumstances, the "good cause" standard of Rule 26(c) applies to the sealing request. See Kinetic Concepts II, 2010 WL 1418312, at *10; see also BASF Agro B.V. v. Makhteshim Agan of N. Am., Inc., No. 1:10cv276, 2015 WL 12991090, at *4 (M.D.N.C. July 21, 2015) ("If the[ relevant] documents only asked this court to rule on procedural discovery grounds, this court would only need to find that good cause existed for sealing these documents."). Under Rule 26(c), "[t]he [C]ourt may, for good cause, issue an order to protect a party or person from," inter alia, "undue burden or expense," Fed. R. Civ. P. 26(c)(1), including by restricting access to certain materials, see, e.g., Fed. R. Civ. P. 26(c)(1)(F)-(H) (authorizing sealing of depositions, confidential commercial information, and "specified documents or information"). "Similarly, the common law presumption of access may be overcome if competing interests outweigh the interest in access, such as where

16

a need exists to prevent court files from becoming sources of business information that might harm a litigant's competitive standing." Kinetic Concepts II, 2010 WL 1418312, at *10 (internal quotation marks, brackets, and citation omitted).

## II. Analysis

### A. Plaintiffs' Motion

Plaintiffs' Motion seeks to compel, inter alia, "full and complete responses to [Document] Request Nos. 2, 7, and 14 in [the Written Discovery] and to Document Request Nos. 3 and 9 in [the Deposition Discovery]." (Docket Entry 154 at 2.) The relevant Written Discovery Document Requests state:

> 2. Any and all documents discussing, relating to, or constituting communication identified in response to Interrogatory No. 20.[8]
>
> *****

---

8 That Interrogatory provides:

> 20. Identify — (a) by stating the date of the communication; (b) by stating the name and last-known address and telephone number of each party who participated in or was a party to the communication; (c) by describing the mode of communication (*e.g.*, in-person meeting, telephone call, e-mail, etc.); and (d) by describing the substance of the communication (without stating any person's name, address, or driver's license information derived from an Accident Report) — each and every communication between or on behalf of you and your law firm, on one side, and any person or entity that provided you or your firm with information derived from Accident Reports, on the other side, at any time.

(Docket Entry 154-1 at 9.)

7. All communication with any outside marketing entity about the Letter-Writing Program.

\*\*\*\*\*

14. All electronically stored information created or received by you or any of your partners, members, shareholders, or managers dealing with your targeted direct mail program or Letter-Writing Program.

(Docket Entry 154-1 at 11-12, 14.) In turn, the pertinent Deposition Discovery Document Requests seek:

3. Any and all documents (including copies of the letters themselves) identifying persons to whom the [relevant] firm sent or attempted to send letters in connection with its direct mail marketing program at any time on or after January 1, 2012.

\*\*\*\*\*

9. All records that contain the names and/or addresses of persons who were sent direct mail advertisement since January 1, 2012.

(Docket Entry 154-2 at 4, 5, 10, 11, 16, 17.)

In addition to seeking "full and complete responses" to the foregoing Document Requests, Plaintiffs ask the Court to order the following:

(2) In the case of the DeMayo and Greve Defendants, to preserve and to produce records of all persons to whom mailings continue to be sent;

(3) To compel the Defendants to appear at reconvened Rule 30(b)(6) depositions at their own expense and to testify as to matters about which they were unprepared to answer and/or to order the Defendants to provide sworn statements relating to such matters;

18

(4) To order that [DeMayo Defendants and Greve Defendants[9]] make their computer systems available for inspection by Information Technology professionals selected by Plaintiffs' counsel to locate electronically stored data that Defendants have failed and refused to provide, and to pay the expenses related to such inspection and/or that Defendants cause the person or persons most familiar with their information technology [to] conduct a search for and produce the requested information, and then to make such persons available for deposition at their expense; and

(5) For an award of sanctions included attorney's fees relating to Plaintiffs' efforts to obtain the subject documents and information.

(Docket Entry 154 at 2-3.)

In support of these requests, Plaintiffs contend that DeMayo Defendants, Greve Defendants, and Gelshenen Defendants (collectively, the "MTC Defendants") "have failed and refused to produce their lists of persons whose information they obtained and/or used in connection with their mass-mailing programs." (Docket Entry 156 at 3.) Plaintiffs further emphasize that, notwithstanding the initiation of this lawsuit, DeMayo Defendants and Greve Defendants have continued their mailing programs, but failed to properly preserve, let alone produce, the relevant spreadsheets and advertising letters. (See id. at 4-6; see also Docket Entry 156-1 at 12; Docket Entry 156-2 at 12-14; Docket Entry 156-4 at 15-16.) For instance, per the submitted deposition

_____

9    Plaintiffs' Motion refers generically to "Defendants" (Docket Entry 154 at 3) in this request, but their supporting memorandum clarifies that the request applies only to "the DeMayo and Greve Defendants" (Docket Entry 156 at 8; see id. at 8-9).

testimony, DeMayo Defendants continued to shred the spreadsheets that they created to determine to whom to send the mailings involved in this litigation for more than a month after Plaintiffs' counsel asked Michael DeMayo ("DeMayo") at his individual deposition — taken three years after the initiation of this lawsuit — to "agree from this point forward to make sure that those spreadsheets are not getting deleted" (Docket Entry 156-1 at 12). (See Docket Entry 156-2 at 12-14.)[10]  In addition, at that deposition, DeMayo confirmed that he had not "made any effort to determine the names of the people that [DeMayo Firm] ha[d] sent mailings to."  (Docket Entry 156-1 at 14-15.)

At his own deposition two days later, Theodore A. Greve ("Greve") testified that Greve Firm "back[s] up [its] computer systems regularly" (Docket Entry 156-4 at 15), but otherwise had taken no "special steps" to ensure the spreadsheets' preservation (see id. at 16), even though, per Greve Firm's subsequent deposition, Greve Firm's "practice is just that the[ spreadsheets and associated mailing labels] get overwritten every day" (Docket Entry 156-5 at 6) after the relevant "names and addresses are printed out on labels," which "get stuck on an envelope" and "put

---

10  DeMayo Defendants engaged in this practice notwithstanding their admission that one must "have the filtered data from [their] office" to determine whether they "sent a mailer to a particular person who was involved in a wreck."  (Id. at 17-18.)

in the mail" (id. at 4).[11]   Notwithstanding this practice, Greve

Firm understands that "the spreadsheets and the labels[] should be

available in [its] computers" (id. at 7-8).  (See also id. at 7

("It is [Greve's] understanding that the information, if it came

through the computer, would likely be in the computer system

somewhere.").)   However, Greve Firm testified that it had not

produced any of the requested labels, including those generated

between Greve's deposition and Greve Firm's deposition more than

two months later (see, e.g., id. at 10, 23), "[b]ecause [it]

ha[d]n't hired someone to go in and dig into the deep, dark reaches

of the computer to see if they're there" (id. at 9), and that it

would require an expert to locate the relevant information in its

computer system (see id. at 14; accord id. at 10).

     Finally, Gelshenen Defendants' testimony reflects that, prior

to Gelshenen Firm's deposition, they provided to their counsel the

spreadsheets that they created in 2016 and 2017 based on

information obtained from Digital Solutions of the Carolinas

("Digital Solutions").  (See, e.g., Docket Entry 156-7 at 3, 7.)

---

     11   Greve Firm disclosed the overwriting in response to
Plaintiffs' counsel's question about why Plaintiffs had "not
received any spreadsheets []or any labels," explaining that Greve
Firm's "practice is not to print those out."  (Id.; see also Docket
Entry 156-4 at 10 (indicating that Greve Firm did not produce "any
Digital Solutions spreadsheets," which Greve Firm downloads each
business day that such spreadsheets become available, "[b]ecause
[Greve Firm] do[es]n't print them out").)   Nevertheless, Greve
acknowledged that he bore a duty to preserve ESI relevant to the
lawsuit, not just hard-copy materials.  (See Docket Entry 156-4 at
10-12.)

Gelshenen Defendants further explained that they obtained "accident reports from local police departments" and a certain website "from March 2015 to December 2015," but used Digital Solutions from January 2016 until they stopped their mailing program. (Docket Entry 156-6 at 5.)[12] Although Gelshenen Firm testified that it had produced all of the spreadsheets from 2016 and 2017 to its counsel (see Docket Entry 156-7 at 3, 7, 17), defense counsel produced only four days' worth of spreadsheets from one week in 2016 to Plaintiffs in connection with Gelshenen Firm's deposition (see id. at 6-7). (See also Docket Entry 105-23 at 2-5 (indicating that, "right before the [Gelshenen Firm] deposition," Gelshenen Firm's "counsel handed" Plaintiffs' counsel "some stacks of documents," id. at 2, as "the documents that are responsive to th[e Deposition Discovery]," id., including, as "a representative sample," four spreadsheets constituting "one week's" worth of spreadsheets that Gelshenen Firm's counsel "just picked . . . somewhere and printed," id. at 4).) At its deposition, Gelshenen Firm also committed to searching for responsive information from 2015 (see Docket Entry

---

12 Plaintiffs' memorandum indicates that Gelshenen "[F]irm stopped mailing to North Carolina residents after it learned about filing of the *Garey* action," but "recommended the mailings in June 2017, and then stopped once and for all in about September 2017." (Docket Entry 156 at 7; see also Docket Entry 156-6 at 5 (testifying that Gelshenen Firm "used Digital Solutions" from "January 2016 onward" until they stopped the program entirely, but that "[t]here's some time periods in there that [they] didn't — [they] stopped at different times in those dates")).

22

156-7 at 14, 16),[13] but Plaintiffs' memorandum asserts that they "have heard nothing since" the deposition about the results of such search (see Docket Entry 156 at 8 n.3).

Against this backdrop, MTC Defendants raise three arguments in opposition to Plaintiffs' Motion. (See generally Docket Entry 161.) First, they contend that the requested information, including "[m]ailing lists, distribution lists, and mail merge materials[,] no longer have any probative value based on the new class definition" found in the Second Amended Complaint. (Id. at 2; see also, e.g., id. at 3-5.) Second, they contend that "Plaintiffs have suffered no harm, because other similarly-situated defendants — who obtained the same DMV-349 public records and summaries of public records (on Excel spreadsheets) from the same third-party data aggregators during the same time period — have already produced those documents." (Id. at 2.) Third, they contend that "the discovery sought from the DeMayo Defendants and the Gelshenen Defendants has been produced" (id. at 3) since the filing of Plaintiffs' Motion (see id. at 7, 13), and, "[a]s a result, [Plaintiffs' Motion] is moot, and no sanction should be awarded" (id. at 3). These arguments lack merit.

To begin, Plaintiffs' proposed class consisted of every individual identified on certain accident reports as a North-

_____

13 Gelshenen Firm planned to try to retrieve the filtered spreadsheets from an old mail room email account to which Gelshenen Firm sent them. (See id. at 14, 16.)

Carolina-licensed driver whose address matched the address on the individual's driver's license (1) whose name or address a defendant <u>received</u>, directly or indirectly, from such accident reports and/or (2) to whom a defendant <u>sent</u> a qualifying mailing. (<u>See id.</u> at 4 (quoting Docket Entry 100, ¶ 73).)[14]  Thus, MTC Defendants err in asserting that, "[i]n light of the Plaintiffs' alteration of their class definition in the Second Amended Complaint (which expands the scope of liability to include ***any*** motorist whose name ***appeared on*** an accident report, rather than motorists like the Named Plaintiffs who received mailings at their homes), much of the sought-after discovery has lost its relevance." (<u>Id.</u> at 2 (emphasis in original); <u>see also</u> <u>id.</u> (contending that "the defendant-specific screening or filtering criteria (and resulting mailing lists) now have no probative value in understanding who are members of the class").)  Rather, "[m]ailing lists, distribution lists, and mail merge materials [continued to have] probative value based on the new class definition" (<u>id.</u> at 2), and "whether [a] motorist's name and address was culled or scrubbed by Defendants (because the motorist was at-fault, because the case did not fit the profile of cases which a particular law firm would send mailers to, or because

---

14  Accordingly, contrary to MTC Defendants' contentions, neither of Plaintiffs' subclasses encompassed "'every natural person' who is 'identified on a DMV-349' which was prepared either by the 'Charlotte-Mecklenburg Police Department o[r] the North Carolina State Highway Patrol' for accidents occurring from 2012 to the present" (<u>id.</u> at 6-7).

24

of any other reason) or whether they received mail from the Defendants [remained ]relevant" (<u>id.</u> at 4-5) after Plaintiffs filed the Second Amended Complaint.

Next, relying in part on their contention that, "[u]nder the revised class definition, only the documents received from Digital Solutions of the Carolinas are relevant" (<u>id.</u> at 2), MTC Defendants assert that "Plaintiffs have suffered no harm" (<u>id.</u>) from MTC Defendants' failure to timely produce the requested information because another defendant allegedly produced spreadsheets from Digital Solutions. (<u>See, e.g.</u>, <u>id.</u> at 2, 7.) In particular, MTC Defendants maintain that "a co-defendant (Estwanik & May) has produced 1,474,947 pages of documents; primarily the exact same Excel spreadsheets and .pdf images of accident reports which the DeMayo firm received from Digital Solutions during the exact same time period." (<u>Id.</u> at 7; <u>accord</u> 9-10, 12-13.) They also assert, as to Greve Defendants, that "other co-defendants who did receive information from Digital Solutions regarding the Raleigh metropolitan area (Hardison & Cochran, Law Offices of Jason E. Taylor, and Estwanik & May) have already produced 395 documents with responsive information. This is in addition to the documents – largely the same public records obtained from Digital Solutions – produced by other co-defendants in this action and in *Garey v.*

*Farrin*, 1:16-CV-542." (<u>Id.</u> at 10.)[15] However, MTC Defendants provide no support for these contentions (<u>see</u> <u>id.</u> at 7, 9-10, 12-13), and "statements by counsel in briefs are not evidence," <u>Cochran</u>, 931 F. Supp. 2d at 730.

MTC Defendants further assert that a proffered email establishes that "Plaintiffs' counsel is in possession of the[] relevant "Digital Solutions documents." (Docket Entry 161 at 10; <u>see also</u> <u>id.</u> at 10-11 ("Because only the Digital Solutions documents are probative, and because Plaintiffs' counsel is in possession of them, Plaintiffs' [M]otion should be denied.").) However, this email merely reflects that counsel for the plaintiffs in <u>Garey</u> "has obtained documents from Digital Solutions and others

---

15      Greve Defendants also appear to argue that the spreadsheets that they received regarding the Raleigh metropolitan market "include[] accident reports and public records from the Wake County Sheriff's Office, Raleigh Police Department, and local law enforcement in or around Wake County." (<u>Id.</u> at 9.) In Greve Defendants' view, "[o]nly the public records which the Greve Defendants received from Digital Solutions, and only records related to the geographic region included in the class definition are relevant and probative. Plaintiffs' request for outgoing mail list, and requests for information related to the Raleigh metropolitan area, are not probative on any remaining issue in the case." (<u>Id.</u>) This contention also falls short. By virtue of the proposed classes' inclusion of the North Carolina Highway Patrol accident reports, "the geographic region included in the class definition" (<u>id.</u>) constituted the entire State of North Carolina. <u>See</u> North Carolina Highway Patrol Troop and District Boundaries, https://www.ncdps.gov/our-organization/law-enforcement/state-highway-patrol/troop-offices (last visited Oct. 21, 2020). Accordingly, information regarding qualifying accident reports that the North Carolina Highway Patrol prepares in the Raleigh metropolitan area remained relevant under the Second Amended Complaint's proposed class definition.

in the Garey case that relate to [this] case." (Docket Entry 161-1 at 2.) The email provides no insights regarding the nature or scope of the "obtained documents" (id.) and, in any event, more than the Digital Solutions documents remained probative (and responsive) here prior to the Certification Opinion. As such, MTC Defendants' "no harm" contention misses the mark.

Finally, MTC Defendants assert that "the information sought by [Plaintiffs' M]otion . . . was provided to Plaintiffs on May 5, 2020," on behalf of Gelshenen Defendants (Docket Entry 161 at 13), and on April 28, 2020, on behalf of DeMayo Defendants (id. at 7). Thus, MTC Defendants contend, Plaintiffs' Motion "is moot, and no sanction should be awarded." (Id. at 3.) As a preliminary matter, MTC Defendants provide no evidence in support of their assertion that production of (all) the information that Plaintiffs' Motion seeks from DeMayo Defendants and Gelshenen Defendants has occurred. (See id. at 3, 7, 13.) To the contrary, questions remain regarding the completeness of the belated productions. (See Docket Entry 163 at 2 & n.2.) Accordingly, MTC Defendants have not established that the alleged belated production mooted Plaintiffs' Motion as to DeMayo Defendants and Gelshenen Defendants. See Cochran, 931 F. Supp. 2d at 730. Moreover, the simple fact that certain MTC Defendants produced materials after Plaintiffs filed their motion to compel (see Docket Entry 161 at 3, 7, 13; Docket Entry 163 at 2 & n.2) does not mean that "no sanction should be awarded" (Docket

27

Entry 161 at 3). Rather, the Rules mandate expense-shifting "if the disclosure or requested discovery is provided after the motion [to compel i]s filed" unless (1) the movant filed the motion without first attempting in good faith to obtain the requested information without court action, (2) "the opposing party's nondisclosure, response, or objection was substantially justified," or (3) "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A).

In sum, MTC Defendants' arguments do not justify denial of Plaintiffs' Motion. See Kinetic Concepts I, 268 F.R.D. at 243-44. However, after the parties briefed Plaintiffs' Motion, the Certification Opinion denied Plaintiffs' request for class certification (see Docket Entry 200 at 19), effectively ending Plaintiffs' need for MTC Defendants' "lists of persons whose information they obtained and/or used in connection with their mass-mailing programs" (Docket Entry 156 at 3). Under the circumstances, including the limited continuing relevance of the requested discovery in light of the Certification Opinion, the Court finds that proportionality concerns preclude the additional discovery that Plaintiffs seek (see Docket Entry 154 at 2-3 (requesting, inter alia, additional document production, reconvened depositions, and forensic inspection of certain MTC Defendants' computer systems)). See Fed. R. Civ. P. 26 advisory committee's notes, 2015 Amendment ("The parties and the court have a collective

28

responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes.").

Although issuance of the Certification Opinion forestalls compelled compliance with Plaintiffs' outstanding discovery requests, it does not absolve MTC Defendants of their discovery failures. At the very latest,[16] DeMayo Defendants and Greve Defendants were "placed on notice that the [requested] evidence [wa]s relevant to the litigation," Eckhardt, 2008 WL 1995310, at *5, when they were sued in July 2016. (See generally Docket Entries 1, 5.) Yet, for more than three years, they failed to preserve (but instead continued to create and destroy) relevant material, such as the filtered spreadsheets and mailing labels used in their disputed direct-mail-marketing programs. (See, e.g., Docket Entry 156-1 at 12; Docket Entry 156-2 at 12-14; Docket Entry 156-4 at 15-16; Docket Entry 156-5 at 6.) Such conduct, particularly by experienced litigators like DeMayo Defendants and Greve Defendants, violates well-recognized standards. See, e.g., Nacco Materials Handling Grp., Inc. v. Lilly Co., 278 F.R.D. 395, 402-07 (W.D. Tenn. 2011) (finding defendant breached its

---

16  Arguably, given the claims at issue, a duty to preserve the requested information, including in particular the filtered spreadsheets and Digital Solutions materials, arose no later than the date on which MTC Defendants learned of the Garey action, filed in May 2016, see generally Garey, No. 1:16cv542, Docket Entry 1. See Silvestri, 271 F.3d at 591 ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.").

preservation duties, and awarding sanctions for spoliation, "where [the defendant] failed to timely issue an effective written litigation hold, to take appropriate steps to preserve any existing electronic records, to suspend or alter automatic delete features and routine overwriting features, and to timely and effectively collect ESI," id. at 404).

Given the above-detailed conduct, Plaintiffs "request that the Court enter sanctions against the DeMayo, Greve, and Gelshenen Defendants as provided in Rule 37(a), (d), and (e), including, at a minimum, an award of reasonable attorneys' fees. Plaintiffs submit that severe sanctions are warranted here." (Docket Entry 156 at 11.) As noted, Rule 37(a) mandates expense-shifting when a party produces the requested material after a motion to compel's filing and (1) the moving party attempted in good faith to obtain the requested material without court intervention, (2) no substantial justification appears for the opposing party's actions, and (3) no other circumstances render expense-shifting unjust. See Fed. R. Civ. P. 37(a)(5)(A).

In turn, Rule 37(d) authorizes expense-shifting, as well as "any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)," Fed. R. Civ. P. 37(d)(3), where a party fails to appear at a properly noticed deposition or respond to discovery. Fed. R. Civ. P. 37(d)(1). Those cross-referenced sanction orders include:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part; [or]

(vi) rendering a default judgment against the disobedient party[]. . . .

Fed. R. Civ. P. 37(b)(2)(A).

Finally, Rule 37(e) specifies two options if ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). First, "upon finding prejudice to another party from loss of the information, [the Court] may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Second, "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation," the Court may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e)(2).

Aside from contending that "severe sanctions are warranted," "including, at a minimum, an award of reasonable attorneys' fees" (Docket Entry 156 at 11), Plaintiffs do not propose any specific sanctions (see Docket Entries 154, 156, 163). Further, even setting aside the effects of the Certification Opinion, the record does not illuminate what particular sanctions, beyond expense-shifting, MTC Defendants' conduct would warrant given the nature of the information at issue. Accordingly, particularly in light of the recent developments, the Court finds that an award of attorney's fees constitutes an appropriate sanction for MTC Defendants' conduct.

The Court further finds expense-shifting appropriate under Rule 37(a)(5)(A) as to DeMayo Defendants and Gelshenen Defendants in light of their belated productions. In this regard, the record reflects Plaintiffs' good-faith attempts to obtain the requested discovery without court intervention (see, e.g., Docket Entry 154-3 at 2-15), but reveals neither substantial justification for these defendants' refusal to timely provide the requested discovery nor any circumstances that would render "an award of expenses unjust," Fed. R. Civ. P. 37(a)(5)(A)(iii). However, because Gelshenen Defendants produced their filtered spreadsheets from 2016 and 2017 to their counsel before Gelshenen Firm's deposition and their

32

counsel decided to produce only four days' worth of such spreadsheets from 2016 as "a representative sample" (Docket Entry 105-23 at 4; <u>see</u> <u>id.</u> at 2-6), the Court finds that Gelshenen Defendants and their counsel shall share responsibility for a portion of the shifted expenses. <u>See</u> Fed. R. Civ. P. 37(a)(5)(A) (authorizing expense-shifting onto responsible attorney).

Finally, the Court finds expense-shifting appropriate under Rule 37(d) as to Greve Firm, which, <u>inter alia</u>, "fail[ed] to serve its answers, objections, or written response," Fed. R. Civ. P. 37(d)(1)(A)(ii), to the Deposition Discovery. In particular, at Greve Firm's deposition, Greve conceded that Greve Firm possessed material responsive to Deposition Discovery Document Requests 3 and 9 but failed to produce it at or before the deposition, as the Deposition Discovery requested (<u>see</u> Docket Entry 154-2 at 7) and the Rules permit, <u>see</u> Fed. R. Civ. P. 30(b)(2). (<u>See</u> Docket Entry 156-5 at 12-13, 18-19.)[17] The record further reflects Plaintiffs' good-faith attempts to obtain the requested discovery without court intervention (<u>see, e.g.</u>, Docket Entry 154-3 at 1, 5-6, 8-9, 12-15),

_____

    17  In this regard, although he explicitly conceded Greve Firm's failure to produce materials responsive to Document Request 3 (<u>see</u> <u>id.</u> at 13), Greve maintained that "[he was] producing all the information [responsive to Document Request 9] because [he was] telling [opposing counsel at the deposition] exactly how to get it and who has it," including specifically that "if it's available in the computers, an IT person that maybe has a similar background to Mr. Hatch might be able to access [it]" (<u>id.</u> at 19).  That assertion lacks merit and, in any event, tacitly admits Greve Firm's failure to comply with the requirement "to produce documents and tangible things at the deposition," Fed. R. Civ. P. 30(b)(2).

but reveals neither substantial justification for Greve Firm's refusal to provide the requested discovery nor any circumstances that would render "an award of expenses unjust," Fed. R. Civ. P. 37(d)(3).

In sum, the recent Certification Opinion obviates the need for compelled production as to Plaintiffs' outstanding discovery requests. However, the Court grants Plaintiffs' request for expense-shifting as to Plaintiffs' Motion, due to the belated production made after the filing of Plaintiffs' Motion and Greve Firm's failure to serve a proper response to Deposition Discovery Document Requests 3 and 9.[18] As discussed above, Plaintiffs undertook good-faith efforts to secure the information without court intervention, MTC Defendants failed to establish substantial justification for their actions, and no other circumstances render expense-shifting unjust. Under the circumstances, the Court further finds that (1) DeMayo Defendants shall bear a third of the expenses, (2) Greve Firm shall bear a third of the expenses, and (3) Gelshenen Defendants and their counsel shall bear the remaining third of the expenses.

**B.  Sealing Motion**

Next, the Sealing Motion seeks to seal certain information in Plaintiffs' exhibits and memorandum in support of Plaintiffs'

---

18  Under the circumstances, the Court need not separately evaluate the propriety of sanctions under Rule 37(e).

34

Motion. (See Docket Entry 157 at 2.) In particular, the Sealing Motion requests sealing of portions of certain discovery responses and deposition testimony by MTC Defendants and the references to such information in Plaintiffs' memorandum. (See id.; see also Docket Entry 156 to 156-7.) As noted, "Plaintiffs do not claim the material is confidential and do not believe any of it is" (Docket Entry 157 at 2), but MTC Defendants "seek permanent sealing of the discovery, or at least until trial" (Docket Entry 162 at 8; see generally Docket Entry 162). To support their sealing request, MTC Defendants rely on "the Court's prior guidance on this same issue from its [Sealing] Order" (id. at 3), arguing "that the sealed exhibits (interrogatory responses and deposition transcripts from [MTC Defendants]) contain sensitive information regarding the process and procedures that th[e relevant l]aw [f]irms use in operating their direct mail programs, including case selection information" (id. at 6; see also id. ("This Court has already determined that Defendants' case selection methods and criteria are sensitive business information which should be sealed." (emphasis omitted))).

Plaintiffs filed the Sealing Motion in April 2020. (See Docket Entry 157.) Accordingly, the Court finds that all interested persons have received "notice of the request to seal and a reasonable opportunity to challenge the request," Washington

Post, 386 F.3d at 576.[19]  Further, given the nature of Plaintiffs'
Motion, arguably no public right of access applies to the relevant
materials, subjecting them only to Rule 26(c)'s "good cause"
standard.  See Kinetic Concepts II, 2010 WL 1418312, at *9-10; see
also BASF Agro, 2015 WL 12991090, at *4.  Alternatively, to the
extent that the materials qualify as "'judicial records' because
they were filed with the objective of obtaining judicial action or
relief pertaining to [Plaintiffs' Motion]," In re U.S., 707 F.3d at
291, the common-law right of access applies, see BASF Agro, 2015 WL
12991090, at *4 (explaining that, "it may also be that these briefs
and exhibits are judicial records because they were filed with the
objective of . . . supporting . . . a motion to compel" and, as
such, "the common-law presumption of access attaches to these
documents").  Thus, "because the [United States Court of Appeals
for the] Fourth Circuit has not definitively resolved the access
right question in the discovery motion context, the Court will
conduct the 'competing interests' balancing test that would govern
if the common-law access right did apply, along with the 'good
cause' inquiry."  Kinetic Concepts II, 2010 WL 1418312, at *10.

    In this regard, the Court (per Judge Biggs) has already
determined that the specific type of information that MTC
Defendants seek to seal qualifies as "sensitive business

_____

    19  The docket reflects no objections to the Sealing Motion.
(See Docket Entries dated Apr. 21, 2020, to present.)

36

information" that warrants sealing (Docket Entry 152 at 5) under the common-law analysis (see id. at 3-7). Sealing likewise remains proper under Rule 26(c)'s "good cause" standard, as previously recognized by the parties (see Docket Entry 103 at 1-3 (defining, in Consent Protective Order entered "pursuant to Rule 26" (id. at 1), "'Protected Information'" to include "[d]ocuments or information that disclose the strategies or internal execution of a [d]efendant law firm's efforts to communicate through written correspondence with those involved in vehicular accidents . . . .[,] includ[ing] the criteria by which a [d]efendant law firm selects to whom it will send written communications and the analyses of the effectiveness of any particular set of criteria" (id. at 3))), and rulings in analogous cases, see, e.g., Kinetic Concepts II, 2010 WL 1418312, at *10 (authorizing sealing and redaction of materials under Rule 26(c), and noting that Rule 26(c) authorizes "restrict[ed] access to materials that constitute 'confidential research, development, or commercial information'"). In addition, "the parties have narrowly tailored their proposed redactions to allow for public access to the vast majority of the filings — a less drastic alternative to sealing the documents in their entireties" (Docket Entry 152 at 4). (See Docket Entries 156 to 156-7.)

However, the proposed redactions in Plaintiffs' memorandum and the Greve Firm deposition exhibit encompass publicly disclosed

37

information, negating the justification for sealing. In this regard, notwithstanding the proposed redactions in the memorandum, unredacted deposition testimony in the record reveals the fact that DeMayo Defendants utilize color-coded spreadsheets. (Compare, e.g., Docket Entry 156 at 4 ("The [redacted] spreadsheet is then used to perform a mail-merge function." (citing Docket Entry 156-2 at 12)), with, e.g., Docket Entry 156-2 at 11 (explaining that "a[ DeMayo Firm] staff member will mark the spreadsheet" by "highlight[ing] in different colors," including "orange highlighter" and "yellow"), and id. at 12 (explaining that "th[e] Excel spreadsheet now that's been modified three times or manipulated will now go back to the admin folks, and they will, depending on the notation, mail merge," with such "mail merge[] depending on the category, and they just don't send to the ones that are marked in orange")).

In addition, other proposed redactions from the memorandum and Greve Firm deposition serve no purpose, given that unredacted record testimony reveals the filters that Greve Firm uses in creating their mailing lists. (Compare Docket Entry 156 at 5, and Docket Entry 156-5 at 24-27, with Docket Entry 156-4 at 8-9, and Docket Entry 156-5 at 16.) Because the unredacted testimony submitted in support of Plaintiffs' Motion publicly discloses both that DeMayo Defendants use color-coded spreadsheets and the particular filters that Greve Firm uses, no basis exists to redact

38

such information from other parts of the record. See, e.g., Washington Post, 386 F.3d at 579 ("[O]nce announced to the world, the information lost its secret characteristic." (internal quotation marks omitted).) Accordingly, the Court will grant the Sealing Motion except insofar as it requests redaction of the references (1) to "color-coded" in Plaintiffs' memorandum and (2) to Greve Firm's filters in Plaintiffs' memorandum and the Greve Firm deposition exhibit.

## C. Defendants' Motion

Finally, Womble Defendants seek "an order compelling putative class representative Johnathan Hatch and third party Mark Jetton to produce certain documents that have been requested in this action." (Docket Entry 158 at 1-2.) According to Womble Defendants, "[t]his discovery is critical as it bears on a hidden relationship which has been concealed from Defendants and the Court, which may warrant further hearings by the Court on this matter and ultimately lead to a finding that (1) Mr. Hatch is an inadequate class representative and (2) that counsel of record in this case are inadequate class counsel." (Id. at 2.) In support of their request, Womble Defendants assert that "Hatch's friend, attorney Mark Jetton" (at times, "Jetton"), "may have been representing Mr. Hatch since the beginning of this lawsuit." (Docket Entry 159 at 3.) According to Womble Defendants, "Jetton likely has been serving as hidden counsel for Mr. Hatch and may have a fee-splitting arrangement with

putative class counsel." (Id. at 5.) Womble Defendants further maintain that, if "Jetton has been serving as 'hidden' counsel, heretofore unknown to Defendants or the Court, then, under numerous authorities, Mr. Hatch and current counsel of record should both be found inadequate to represent the class." (Id. at 4.)[20]

Based on these assertions, Womble Defendants seek an order:

(1) compelling third party Mark Jetton to produce any engagement or retainer agreements between Mr. Jetton and putative class representative Johnathan Hatch;

(2) compelling Mr. Hatch, including his counsel of record, to produce any engagement letter or retainer agreement with anyone who is his counsel in this action;

(3) compelling third-party Mark Jetton to produce copies of any communications between him and putative class representative Johnathan Hatch or putative class counsel, Brown, Faucher, Peraldo, & Benson, PLLC;

(4) compelling Mr. Hatch to produce any communications with third-parties, *including emails, text messages, or written communications with Mr. Jetton*;

(5) awarding Defendants their costs and attorney's fees incurred in bringing this motion, pursuant to Rule 37(a)(5);

(6) granting any further relief the Court deems just and proper, which could include a hearing or orders finding Mr. Jetton, Mr. Hatch, current counsel of record, and possibly others as inadequate to represent the class in this matter; and

---

20   Womble Defendants became aware of Jetton in July 2019 (see Docket Entry 158 at 2), less than halfway through the discovery period (see Text Orders dated Nov. 27, 2018, and July 24, 2019). Nevertheless, Womble Defendants waited until the final day of the discovery period — more than three months after briefing on the class certification motion closed (see Docket Entry 147) — to file the instant motion. (See Text Order dated July 24, 2019; see also Docket Entry 158 at 6.)

(7) staying a decision on Plaintiffs' Motion to Certify the Class until this motion to compel and any related discovery or in camera investigation is complete.

(Docket Entry 158 at 5 (emphasis in original).) Hatch and Jetton oppose Defendants' Motion. (See Docket Entry 164.)

As a preliminary matter, the Certification Opinion arguably mooted Defendants' Motion by denying Plaintiffs' request for class certification, negating the need for class counsel and class representatives. (See generally Docket Entry 200.) However, because the Certification Opinion addresses (and upholds) the adequacy of Plaintiffs and their counsel for class representation purposes (see, e.g., id. at 15 ("conclud[ing] that Plaintiffs and their counsel would adequately represent the class")), the undersigned will analyze the merits of Defendants' Motion.

In July 2019, Womble Defendants deposed Hatch. (See Docket Entry 164-2 at 2-3.) At that deposition, Hatch testified that he contacted Jetton shortly after his accident in September 2015 "because [Hatch] received a significant amount of mailers and it made [him] concerned that [he] was going to be sued or [he] needed some kind of legal counsel" (id. at 6). (See id. at 5-6.) As such, Hatch "reached out to [his] lawyer, [his] lawyer," Mark Jetton. (Docket Entry 134-8 at 14-15; see also id. at 21 (explaining that, due to the mailers, Hatch "thought that there was going to be some kind of legal action that was needed, that's why [Hatch] reached out to [his] lawyer Jetton").) Hatch "know[s ]

41

Jetton through college football days[, s]o [Hatch] asked a few questions of [Jetton] and [Jetton] placed [Hatch] in contact [with Plaintiffs' counsel]." (Docket Entry 164-2 at 10.) Hatch had "reached out to [Jetton] about legal matters before" (id. at 12), and "ha[s] used [Jetton] as a lawyer in other things" (id. at 13), but "do[es] not believe" that he either "sign[ed] an engagement letter with [Jetton]" or "retain[ed Jetton] for this class action" or "the accident" (id.). Hatch did, however, "consult [Jetton] on his thoughts on" dealing with the insurance company regarding the underlying accident. (Docket Entry 134-9 at 81.)

Hatch further testified that he did not know Plaintiffs' counsel prior to consulting Jetton, who "put [him] in contact" with Plaintiffs' counsel. (Docket Entry 164-2 at 10.) More specifically, Hatch, Jetton, and Plaintiffs' counsel participated in a three-way call so that Jetton could "connect [Hatch]" with Plaintiffs' counsel. (Id. at 15.) Although Hatch "ha[s] spoken with [Jetton] about a multitude of things" since that call, Hatch does not recall speaking to Jetton about either the call or the lawsuit (id. at 14), other than perhaps "telling [Jetton that Hatch is] still working with [Plaintiffs' counsel], but [Hatch] do[es]n't remember any specifics or anything of that nature" (Docket Entry 134-9 at 80-81). Hatch also does not recall Jetton participating "in any other conference calls with [Hatch] and [his] counsel in this case." (Id. at 81.) However, Hatch once "had to use

42

[Jetton's] office because [Plaintiffs' counsel] and [Hatch] are not located in the same city, so [Hatch] had to send [Jetton] e-mails to get some stuff signed." (Id.)  In addition, in connection with their initial consultation, Hatch provided the mailings that he received to Jetton to give to Plaintiffs' counsel.  (Id. at 4; see also Docket Entry 164-2 at 7.)

Finally, during the deposition, Plaintiffs' counsel and Hatch repeatedly asserted that attorney-client privilege applied to Hatch's initial communications with Jetton.  (See, e.g., Docket Entry 164-2 at 7-9, 13, 15.)  For instance, in response to questions that elicited "advice [Hatch] received from Jetton," Plaintiffs' counsel asserted that such advice "is attorney-client privileged," explaining that Hatch "consulted with Mr. Jetton." (Id. at 8-9.)  In addition, when Womble Defendants asked what Plaintiffs' counsel, Hatch, and Jetton discussed during their telephone call, Hatch responded that "[i]t was a conversation with my lawyers" and Plaintiffs' counsel objected to Womble Defendants' claim that "earlier [Hatch] testified that Mr. Jetton was not your lawyer," asserting:  "No, he didn't.  Objection to form.  No, he didn't.  He said he didn't retain him formally.  He didn't say –" (Id. at 13; see also id. (testifying, in response to Womble Defendants' assertion, that "[Hatch] didn't retain [Jetton] for this accident, but [Hatch] ha[s] used him as a lawyer in other

43

things," even if "[Hatch] do[es] not believe" that he "retain[ed] Jetton] for this class action").)

Thereafter, Womble Defendants served a subpoena on Jetton. (See Docket Entry 159-1 at 2-5.)  The subpoena sought:

> 1. Any and all written communications including emails, instant messages, and text messages with attorney Drew Brown or his law firm, Brown, Faucher, Peraldo, & Benson, PLLC [(i.e., Plaintiffs' counsel)], regarding Johnathan Hatch or the [DPPA].
>
> 2. Any and all notes of any telephone calls or other non-telephonic conversations with Johnathan Hatch between March 2016 and September 2016.
>
> 3. Any and all notes of any telephone calls or other non-telephonic conversations with attorney Drew Brown or his law firm, Brown, Faucher, Peraldo, & Benson, PLLC regarding Johnathan Hatch or the [DPPA].

(Id. at 5.)  Jetton objected to each of these requests on the grounds that "th[e] information is protected by the attorney client privilege and is work product information."  (Docket Entry 159-2 at 2-3.)  According to Womble Defendants, "no privilege log was produced."  (Docket Entry 159 at 6.)

The memorandum in support of Defendants' Motion further states:

> Undersigned counsel exchanged meet-and-confer correspondence with Mr. Jetton, where he repeatedly referred to Mr. Hatch as his client.  Undersigned counsel called Mr. Jetton to discuss his objections.  During the call, Mr. Jetton stated that he does in fact represent Mr. Hatch in this class-action and that he has been working with Mr. Brown and Mr. Faucher since 2016 on the matter.  (Exhibit C, [November 20, 2019, Reich email]. He also said that he "intend[s] to be part of any settlement or judgment in the case."  (Ex. C.). [sic] When asked about why his statements contradicted Mr.

44

> Hatch's deposition testimony, Mr. Jetton said that Mr.
> Hatch's testimony was inaccurate and reflects a
> misunderstanding of Mr. Jetton's role in this action.
> (Ex. C.)

(Docket Entry 159 at 6-7 (brackets and missing closed parenthesis in original).)[21]

However, the email on which Womble Defendants rely for these assertions does not constitute competent evidence of their contentions. (See generally Docket Entry 159-3.) Rather, this email, addressed from Womble Defendants' counsel to Jetton and dated as sent on November 20, 2019, merely contains Womble Defendants' counsel's uncorroborated description of Jetton's alleged statements during a purported call with Womble Defendants' counsel. (Id. at 2.) The email's final paragraph asks, "[i]s this an accurate recollection of our call?" (Id.) Notably, though, the exhibit contains no response from Jetton. (See id. at 1-6.) As such, it amounts to hearsay, see Fed. R. Evid. 801(c), and an attorney's unsworn statements, whether in a memorandum or a supporting exhibit, do not otherwise qualify as evidence, see Cochran, 931 F. Supp. 2d at 730.

---

21 In its introduction, Womble Defendants' memorandum cites to the "(Affidavit of Jonathan Reich)" to support these contentions. (See Docket Entry 159 at 3.) Womble Defendants provided no such affidavit (see Docket Entries 158 to 159-5), and their memorandum elsewhere consistently cites to "(Ex. C.)" to support the relevant contentions (see Docket Entry 159 at 7, 13, 18). Exhibit C does not qualify as an affidavit. (See generally Docket Entry 159-3.)

45

In contrast, Jetton provided a sworn affidavit disputing Womble Defendants' contentions. (See Docket Entry 164-1 (the "Affidavit").) As relevant here, the Affidavit states:

1) I am an attorney licensed to practice in North Carolina.

2) I have ten years['] experience practicing law in the Charlotte area.

3) I graduated from Elon Law School in 2009.

4) During my time at Elon, I developed a professional relationship with attorney Andrew Brown, who spoke at Elon Law School.

5) At some point in 2016, I received a call at my Charlotte office from Mr. Brown.

6) He told me that if I had any car wreck clients who received solicitation mailings from attorneys following a wreck, he would be willing to speak with them about representation under the [DPPA].

7) Following his wreck, my former classmate and client Johnathan Hatch called me regarding his letters which reminded me of my conversation with Mr. Brown. I provided Mr. Hatch with Mr. Brown's phone number.

8) Mr. Hatch did not know Mr. Brown or any attorney in this matter prior to me giving him Mr. Brown's phone number.

9) I have no engagement agreement written or otherwise with Mr. Brown or Mr. Hatch regarding this matter.

10) I have had to expend some time dealing with requests from Womble Bond Dickinson over the last several years regarding this matter. I had to object to requests and now am having to provide this Affidavit.

11) I do believe I ought [to] be paid fairly for my time here. However, no one has offered or agreed to pay me anything and I have no fee split arrangement with Mr. Hatch or anyone else regarding the matters.

46

12) I will not seek to receive any fee from any certified class here.

13) I have not and will not seek to in any way represent any class here.

14) Mr. Hatch is a client and friend. When he seeks legal advice from me on any matter, I consider our communications privileged even if I choose to not take on the matter or to refer him to another attorney.

15) With that said, there were no communications with him here other than simply sending him to Mr. Brown. I have no file of any kind or notes regarding conversations with Hatch about this.

16) I have performed no legal work here for the class. My office staff was used once as I recall to notarize Mr. Hatch's discovery answers in the case but I did not review them at all nor have I consulted with Mr. Brown or anyone else regarding the substance of the representation beyond him thanking me for sending Mr. Hatch and telling me that Hatch was a great client.

(Id. at 2-4.)

In response, Womble Defendants raise a number of challenges to the Affidavit (see Docket Entry 168 at 2-9), which they contend "is facially invalid" (id. at 2 (emphasis and capitalization omitted)). First, Womble Defendants find it "strikingly odd" that the Affidavit "was filed by Class Counsel as an exhibit to the Class Plaintiffs' response in opposition to a motion to compel." (Id. at 4.) In this regard, Womble Defendants contend that, "[d]espite the Jetton Affidavit adamantly disclaiming any relationship to Class Counsel or this class action[,] Class Counsel went to the time and expense of preparing a brief to argue on his behalf." (Id.) In so arguing, Womble Defendants overlook the fact that, in addition to

47

Jetton, they also moved to compel against Hatch and Plaintiffs'
counsel. (See, e.g., Docket Entry 158 at 5.) Particularly under
such circumstances, the fact that Plaintiffs submitted the
Affidavit in support of their opposition to Defendants' Motion
supports no negative inferences.

Womble Defendants then move to other "indicia of
unreliability" (Docket Entry 168 at 5); specifically:

> The Jetton Affidavit includes inadmissible hearsay. Dkt.
> 164-1, ¶6[ ](recounting out-of-court conversation offered
> for the truth of the matter asserted), ¶10 (referring to
> documents ("requests from Womble Bond Dickinson") which
> were not attached to affidavit). The illegible signature
> is dated May 12, 2020, while the notary indicates it was
> signed on May 13, 2020. The Jetton Affidavit also
> contains unsupported legal conclusions. Dkt. 164-1, ¶14
> (making the conclusion that an attorney-client
> relationship exists without offering factual declarations
> to each element of the privilege).

(Docket Entry 168 at 5.) These contentions miss the mark.

First, the Affidavit's statement that Plaintiffs' counsel
"told [Jetton] that if [Jetton] had any car wreck clients who
received solicitation mailings from attorneys following a wreck,
[Plaintiffs' counsel] would be willing to speak with them about
representation under the [DPPA]" (Docket Entry 164-1, ¶ 6) does not
qualify as hearsay because Jetton recounts the conversation with
Plaintiffs' counsel not for the truth of the matter asserted – that
Plaintiffs' counsel would speak with such clients – but rather to
explain why Jetton referred Hatch to Plaintiffs' counsel (see id.,
¶ 7). See Fed. R. Evid. 801(c)(2). Nor does Jetton's statement

that he "ha[s] had to expend some time dealing with requests from Womble Bond Dickinson over the last several years regarding this matter" (Docket Entry 164-1, ¶ 10) qualify as hearsay. See Fed. R. Evid. 801(a)-(c).

Further, the ostensibly "illegible signature" on the Affidavit appears to match the signature on Jetton's objections to the subpoena. (Compare Docket Entry 164-1 at 4, with Docket Entry 159-2 at 3-4.) Womble Defendants also fail to explain how the one-day discrepancy between the preprinted date on the Affidavit and the notary's handwritten date (see Docket Entry 164-1 at 4) renders invalid the Affidavit (see Docket Entry 168 at 5). Finally, rather than providing "unsupported legal conclusions" (id.), the Affidavit merely indicates how Jetton perceives his communications with Hatch "[w]hen [Hatch] seeks legal advice from [Jetton]" (Docket Entry 164-1, ¶ 14).

As a last ground for discounting the Affidavit, Womble Defendants emphasize its conflict with Hatch's testimony regarding the date of Jetton's referral to Plaintiffs' counsel. (See Docket Entry 168 at 5-8.) In particular, Womble Defendants note that Hatch testified he contacted Jetton soon after an accident, which occurred in September 2015 (see id. at 5-6; Docket Entry 164-2 at 5-6), but that Jetton averred Plaintiffs' counsel contacted him in "[a]t some point in 2016," following which "Hatch called [Jetton]" (Docket Entry 164-1, ¶¶ 5, 7). "The fact that [Jetton] may have

49

testified incorrectly regarding the dates of h[is] communications . . . does not compel an inference that [his communications with Hatch] were not privileged." N.L.R.B. v. Interbake Foods, LLC, 637 F.3d 492, 502 (4th Cir. 2011). Moreover, rather than undermining "the credibility of the Jetton Affidavit" or rendering "implausible[ Jetton's] story" (Docket Entry 168 at 7), the fact that Jetton may have incorrectly testified that his contacts with Plaintiffs' counsel and Hatch occurred only four rather than five years previously arguably bolsters Jetton's larger point: that he "ha[s] not and will not seek to in any way represent any class" (Docket Entry 164-1, ¶ 13) and "ha[s] performed no legal work here for the class" (id., ¶ 16). After all, a lawyer who "ha[d] been representing Mr. Hatch since the beginning of this lawsuit" (Docket Entry 159 at 3) would presumably know the correct duration of such representation.

In any event, Womble Defendants' contentions do not undermine the Affidavit's main points, namely that (1) Jetton "ha[s] no engagement agreement written or otherwise with Mr. Brown or Mr. Hatch regarding this matter" (Docket Entry 164-1, ¶ 9); (2) "no one has offered or agreed to pay [Jetton] anything and [Jetton] ha[s] no fee split arrangement with Mr. Hatch or anyone else regarding the matters" (id., ¶ 11); (3) Jetton "will not seek to receive any fee from any certified class here" (id., ¶ 12); (4) Jetton "ha[s] not and will not seek to in any way represent any class here" (id.,

¶ 13); (5) Jetton "ha[s] performed no legal work here for the class" (id., ¶ 16); and (6) "Hatch is a client and friend," such that "[w]hen [Hatch] seeks legal advice from [Jetton] on any matter, [Jetton] consider[s their] communications privileged even if [he] choose[s] to not take on the matter or to refer [Hatch] to another attorney" (id., ¶ 14). This sworn testimony accords with Hatch's deposition testimony regarding his "belie[f]" that he had not "sign[ed] an engagement letter with [Jetton]" or "retain[ed] Jetton] for this class action." (Docket Entry 164-2 at 13.) As such, Womble Defendants' contentions regarding hidden counsel with a close relationship to a putative class representative and an undisclosed monetary interest in the class action (see, e.g., Docket Entry 159 at 2, 4-5, 11-15), lack merit.

Nor do Womble Defendants' contentions regarding the allegedly "binary state" of the attorney-client privilege fare any better. (Docket Entry 168 at 2.) In Womble Defendants' view, "[t]he privilege is a binary state; either Mr. Jetton is counsel to Mr. Hatch in this matter — and thus the privilege adheres — or Mr. Jetton is not counsel in this matter, and the communications that his Affidavit acknowledges and which Mr. Hatch testified to are all discoverable." (Id. (emphasis added).) Such argument construes the attorney-client privilege too narrowly. In evaluating the applicability of the attorney-client privilege, the Court considers whether "the asserted holder of the privilege is or sought to

51

become a client," N.L.R.B., 637 F.3d at 501 (emphasis added) (internal quotation marks omitted),[22] not whether an attorney actually serves as counsel in a particular matter, see id. at 501-02; see also § 5479 Client — "Would-Be Client", 24 Fed. Prac. & Proc. Evid. § 5479 (1st ed.) (explaining that, "[t]he temporal approach to the privileged relationship may have made some sense when lawyers were retained by individual clients to perform discrete tasks[, b]ut it is very difficult to apply in the contemporary world where many lawyers have long-term relations with a client that are not task-defined").

Here, the record reflects that the "significant amount of mailers" Hatch received following his accident "made [him] concerned that [he] was going to be sued or [he] needed some kind of legal counsel" (Docket Entry 164-2 at 6), so he "reached out to [his] lawyer Jetton" (Docket Entry 134-8 at 21; accord Docket Entry

---

22  More fully, the Court assesses whether:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or is his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Id. at 501-02 (internal quotation marks omitted).

52

164-2 at 5-6). Jetton then facilitated Hatch's referral to Plaintiffs' counsel to discuss potential "representation under the [DPPA]" (Docket Entry 164-1, ¶ 6). (See id., ¶ 7; accord Docket Entry 164-2 at 10, 15.) Thus, except to the extent that Hatch may have waived such privilege through his deposition testimony — an issue that Womble Defendants decline to pursue (see Docket Entries 158 (containing no waiver arguments), 159 (same), 168 (same)) — it appears that the attorney-client privilege would apply to at least some of the oral and written communications from these consultations. See N.L.R.B., 637 F.3d at 501-02.

Jetton averred, however, that "there were no communications with [Hatch] here other than simply sending him to [Plaintiffs' counsel. [Jetton] ha[s] no file of any kind or notes regarding conversations with Hatch about this." (Docket Entry 164-1, ¶ 15.) He further declared that he has not "consulted with [Plaintiffs' counsel] or anyone else regarding the substance of the representation beyond [Plaintiffs' counsel] thanking [Jetton] for sending Mr. Hatch and telling [Jetton] that Hatch was a great client." (Id., ¶ 16.) Accordingly, the Affidavit establishes that no relevant responsive documents exist to the subpoena. (See

Docket Entry 159-1 at 5.)[23]  Under the circumstances, the Court will deny Womble Defendants' request to compel information from Jetton.

In addition, Defendants' Motion asks the Court to "compel[] Mr. Hatch, including his counsel of record, to produce any engagement letter or retainer agreement with anyone who is his counsel in this action" (the "Engagement Letter Request") and to "compel[] Mr. Hatch to produce any communications with third-parties, *including emails, text messages, or written communications with Mr. Jetton*" (the "Third Party Request"). (Docket Entry 158 at 5 (emphasis in original).)  As a preliminary matter, the unbounded Third Party Request remains facially overbroad and thus beyond the scope of permissible discovery, see Fed. R. Civ. P. 26(b)(1), and therefore unenforceable, see Fed. R.

_____

    23  To the extent that Womble Defendants seek information from Jetton unrelated to the instant class action (see, e.g., id. (seeking "[a]ny and all notes of any telephone calls or other non-telephonic conversations with Johnathan Hatch between March 2016 and September 2016"); see also Docket Entry 158 at 5 (asking for order "compelling third-party Mark Jetton to produce copies of any communications between him and putative class representative Johnathan Hatch or putative class counsel, Brown, Faucher, Peraldo, & Benson, PLLC")), such information lacks relevance to this action and thus lies beyond the scope of permissible discovery, see Fed. R. Civ. P. 26(b)(1); see also Fed. R. Civ. P. 26(b)(2)(C) ("On motion or on its own, the court must limit . . . the extent of discovery otherwise allowed by these rules . . . if it determines that . . . the proposed discovery is outside the scope permitted by Rule 26(b)(1).").

Civ. P. 26(b)(2)(C). Further, Hatch has disclaimed the existence of any responsive documents. (See Docket Entry 159-5 at 20.)[24]

Similarly, both Hatch and Jetton testified that no engagement agreement exists between them (see Docket Entry 164-1, ¶ 9; Docket Entry 164-2 at 13), and Jetton further averred that he "ha[s] no engagement agreement written or otherwise with [Plaintiffs' counsel]" (Docket Entry 164-1, ¶ 9) and "no one has offered or agreed to pay [Jetton] anything and [he] ha[s] no fee split arrangement with Mr. Hatch or anyone else regarding the[se] matters" (id., ¶ 11). Accordingly, to the extent that Womble Defendants limit the Engagement Request to Jetton, the record indicates that no such document exists. To the extent that Womble Defendants seek to apply the Engagement Request to Hatch's engagement agreement with Plaintiffs' counsel, the Rule 37 Certification in Defendants' Motion does not clearly reflect that the necessary pre-filing conferral occurred. (See Docket Entry 158

_____

24  More specifically, in response to a request for "[a]ll documents and communications exchanged between You and any third party to this lawsuit regarding claims against the DeMayo Firm for alleged DPPA violations, as set form in Your Complaint," Hatch responded:

> Objection . . . . to the extent the Request seeks documents that are protected from discovery under the work product doctrine. Without waiving such objections, other than documents and communications, if any, that may have been exchanged between Plaintiff's counsel and third parties, none.

(Id.)

55

at 7-8 ("[T]he parties[] have met and conferred and the discussions regarding Mr. Hatch's written discovery responses (<u>as they relate to communications with Mr. Jetton and his relationship with Mr. Jetton</u>) have conclusively ended in an impasse, leaving an open issue for the Court to resolve." (emphasis added)).) As such, the Court will deny Womble Defendants' requests to compel responses to the Engagement Letter Request and Third Party Request.

Lastly, Womble Defendants ask the Court to award them their costs and attorney's fees associated with Defendants' Motion. (<u>See</u> <u>id.</u> at 5.) Given the resolution of Defendants' Motion, such expense-shifting remains improper. <u>See</u> Fed. R. Civ. P. 37(a)(5)(B). Plaintiffs do not request expense-shifting (<u>see</u> <u>generally</u> Docket Entry 164) and, under the circumstances, the Court finds that each party should bear its own expenses. In that regard, Defendants' Motion resulted in clarification of Jetton's role in this action via his opposing Affidavit. That circumstance alone warrants denial of expense-shifting. <u>See</u> Fed. R. Civ. P. 37(a)(5)(B) (precluding expense-shifting "if the motion was substantially justified or other circumstances make an award of expenses unjust").

## CONCLUSION

DeMayo Defendants and Gelshenen Defendants produced responsive materials after the filing of Plaintiffs' Motion. The subsequent Certification Opinion renders disproportionate any further

56

compelled response. Additionally, Greve Firm failed to serve a proper response to the Deposition Discovery. Next, Womble Defendants have justified their sealing requests, except as to the information previously, publicly disclosed in this litigation. Finally, the record does not support a finding that Jetton serves as "hidden counsel" in this lawsuit, or otherwise warrant compelled production from Hatch, his counsel, or Jetton regarding such matters.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion (Docket Entry 154) is **GRANTED IN PART AND DENIED IN PART** as follows: Upon determination of the reasonable amount of Plaintiffs' expenses, including attorney's fees, incurred in litigating Plaintiffs' Motion, (1) DeMayo Defendants, (2) Greve Firm, and (3) Gelshenen Defendants (along with their counsel) shall each bear one-third of such expenses.

**IT IS FURTHER ORDERED** that, on or before November 4, 2020, Plaintiffs shall serve DeMayo Defendants, Greve Firm, Gelshenen Defendants, and Womble Defendants' counsel with a statement setting out the reasonable expenses, including attorney's fees, that Plaintiffs incurred in litigating Plaintiffs' Motion. Failure by Plaintiffs to comply with this Order shall result in denial of any expense-shifting as to Plaintiffs' Motion.

**IT IS FURTHER ORDERED** that, if Plaintiffs timely serve such notice setting forth their reasonable expenses incurred in

litigating Plaintiffs' Motion, DeMayo Defendants, Greve Firm, Gelshenen Defendants, and Womble Defendants' counsel shall file, on or before November 17, 2020, **EITHER** a memorandum of no more than five pages (excluding attachments) contesting the reasonableness of the expenses claimed (along with a certificate that DeMayo Defendants, Greve Firm, Gelshenen Defendants, and Womble Defendants' counsel have conferred in good faith with Plaintiffs about such matters), **OR** a notice agreeing to pay the claimed expenses. The failure by DeMayo Defendants, Greve Firm, Gelshenen Defendants, or Womble Defendants' counsel to comply with this Order will result in an award of expenses claimed by Plaintiffs.

**IT IS FURTHER ORDERED** that, if DeMayo Defendants, Greve Firm, Gelshenen Defendants, and Womble Defendants' counsel timely file a memorandum contesting the reasonableness of the claimed expenses, Plaintiffs shall file, on or before November 24, 2020, a memorandum of no more than five pages (excluding attachments) responding to such memorandum. Failure by Plaintiffs to comply with this Order will result in denial of any expenses contested by DeMayo Defendants, Greve Firm, Gelshenen Defendants, and Womble Defendants' counsel.

**IT IS FURTHER ORDERED** that, if Plaintiffs timely file such a response memorandum, DeMayo Defendants, Greve Firm, Gelshenen Defendants, and Womble Defendants' counsel may file, on or before

58

December 1, 2020, a reply of no more than three pages (excluding attachments).

**IT IS FURTHER ORDERED** that the Sealing Motion (Docket Entry 157) is **GRANTED IN PART** and **DENIED IN PART** as follows:  the Sealing Motion is granted except insofar as it seeks redaction of the references (1) to "color-coded" in Plaintiffs' memorandum and (2) to Greve Firm's filters in Plaintiffs' memorandum and the Greve Firm deposition exhibit.

**IT IS FURTHER ORDERED** that, on or before November 4, 2020, Plaintiffs shall file corrected versions of Plaintiffs' memorandum (Docket Entry 156) and the Greve Firm deposition exhibit (Docket Entry 156-5) that remove such redactions.

**IT IS FURTHER ORDERED** that Defendants' Motion (Docket Entry 158) is **DENIED.**

This 21st day of October, 2020.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**